In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4051

Acequia, Inc.,

Plaintiff-Appellant,

v.

Prudential Insurance Company
of America,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 1100--Elaine E. Bucklo, Judge.


Argued May 15, 2000--Decided September 1, 2000


   Before Flaum, Chief Judge, and Cudahy and Evans,
Circuit Judges.

   Cudahy, Circuit Judge.  Acequia, Inc., an Idaho
family farming operation, obtained a $4 million
loan from Prudential in 1977. The security for
the loan was Acequia's 7,600 acres of farm
property. The note was to mature on March 15,
1992. In 1981, Acequia defaulted on the loan.
Prudential began foreclosure proceedings, but
Acequia filed for bankruptcy protection. For the
next two years, Acequia worked on a
reorganization plan; Prudential approved this
Bankruptcy Plan (the Plan) and the bankruptcy
court confirmed it in 1984. But the two companies
continued feuding, and in 1987, Acequia sued
Prudential in Idaho state court because of a
dispute regarding the terms of the promissory
note required by the Plan. This dispute ended in
a 1989 Settlement Agreement, under which
Prudential and Acequia agreed to extend the
deadline for Acequia to repay Prudential. The
Settlement Agreement called for the parties to
execute an amended and restated promissory note,
which they did. Prudential maintains that as part
of the Settlement Agreement, it agreed to
transform the loan into a non-recourse loan
secured only by the land. Under the Settlement
Agreement parcels of land could be sold by
Acequia, but only at minimum prices and under
other prescribed conditions. It is unclear from

the record exactly what recourse Prudential originally had against Acequia, but there is no dispute that under the new Settlement Agreement, Prudential does not have in personam recourse against Acequia for the unpaid portion of the loan.

The parties are again in court because Acequia contends that Prudential has improperly allocated the proceeds of its land sales to Acequia's debt, and that due to the misapplication of funds, Prudential's books show Acequia owing too large an amount. Consequently, because the Settlement Agreement sets a minimum sale price for the farm parcels based on the amount of remaining debt, Acequia maintains that Prudential is asking it to sell the parcels for unreasonably high prices that the market will not bear. The basis for Acequia's charge of improper accounting is language in the Bankruptcy Plan directing the application of farmland proceeds. That language is not identical to the provision governing the application of proceeds in the subsequent Settlement Agreement. Acequia has labelled its complaint "breach of contract," and both parties treat the Settlement Agreement as a contract. See Appellant's Br. at 14; Appellee's Br. at 17. They debate the question whether the Settlement Agreement must be read in conjunction with the Bankruptcy Plan "as a single contract." See Appellant's Br. at 14. Notably, the Settlement Agreement was hammered out independent of the bankruptcy court, but the bankruptcy court later approved it after it had been challenged by an equity security holder. See In re Acequia, 996 F.2d 1223 (9th Cir. 1993) (table), 1993 WL 219865, *2. While in other contexts, plans and agreements adopted pursuant to a declaration of bankruptcy might be viewed as something other than contracts, we agree with the parties that it is reasonable to treat them as contracts here, where they capture a negotiated agreement between two parties which fixes the rights and obligations of each. Our task, therefore, is one of contract interpretation. We must decide how to read the two provisions and whether based on that reading Prudential has acted improperly in applying the terms of the Settlement Agreement.

There is one other issue: namely, whether the court erred in granting summary judgment for Prudential on all eight of Acequia's claims even though Prudential's motion for summary judgment asked for a resolution only of "the accounting issue." The court determined that none of Acequia's claims was viable in light of its favorable ruling for Prudential on the accounting issue. It therefore granted summary judgment on all of the claims.

I.  Breach of Contract

The key issue in this case is what to make of apparently conflicting language in the Bankruptcy Plan and the Settlement Agreement. In order to understand the language, we must review the structure of the Settlement Agreement. As of 1989, when the parties entered that agreement, Acequia owed $3.5 million in principal and $1 million in interest to Prudential. The Settlement Agreement states that

Acequia's existing Plan indebtedness will be set at $4,500,000 as of July 1, 1989, (representing a liquidated, principal balance of $3,500,000 and a liquidated accrued but unpaid interest balance of $1,000,000 under the existing Plan as of June 30, 1989), with interest to be earned thereon from and after July 1, 1989 (the "Loan"). As used hereinafter in this Agreement, "principal" shall refer to all or any portion of the Loan balance, as the case may be, and "interest" shall refer to interest accruing on the Loan balance from and after July 1, 1989.

Appellee's App., Tab 1 at 1.

The amended note executed pursuant to the Settlement Agreement specifically states that "[t]he indebtedness evidenced by this Amended Note represents a liquidated principal balance of $3,500,000 and a liquidated accrued but unpaid interest balance of $1,000,000 under the Original Note, under the Plan as of July 1, 1989 (collectively the "Loan Balance")." See Appellee's App., Tab 2 at 1. The Settlement Agreement defined the $3.5 million principal balance as "Segment A" of what had become the loan balance and the $1 million interest portion as "Segment B" of the loan balance.

Additionally, it is important to understand the Settlement Agreement's terms regarding the sale of Acequia's farm land. The Agreement permits Acequia to voluntarily sell farm land, but requires the company to secure a minimum price for each parcel. The minimum price is defined in the Settlement Agreement. It consists of two components. The first, "Release Value," is a fixed amount the parties agreed to. The second, "Release Interest Component" is the "proportional share of current and accrued interest allocable to that Release Value." Appellee's App., Tab 1 at 4. Consequently, the more interest has accrued on Acequia's total indebtedness, the higher the Release Interest Component on any parcel of farm land, and the higher the Total Release Price.

This background brings us to the contract dispute. Acequia contends that Prudential should have been applying more of the proceeds of its

farm land sales to interest than it has been. The dispute came to a head in 1995 and 1996. Acequia missed its scheduled June 1995 payment of $425,000. It then stated that it intended to sell several parcels of land. Prudential approved the sales, they were completed in 1996, and Acequia netted $1.4 million. Acequia contended the money should be devoted first to cure the default, then to satisfy the 1996 annual payment and then to prepay sums thereafter coming due. Instead, Prudential applied the entire $1.4 million to the Segment A or Segment B debts and the associated interest, as called for in the Settlement Agreement. It applied none of the funds to the 1995 or 1996 annual payments, meaning that Acequia's accrued interest continued to rise. Acequia then complained that Prudential had been improperly applying land sale proceeds since 1990, during a period when annual payments consisted of interest only. As a result, Acequia charges that over the years, the total interest on its indebtedness had been improperly inflated, impermissibly driving up the Release Interest Component and ultimately the Total Release Price for every parcel of land it wishes to sell. Because Acequia has been unable to fetch these "inflated" prices for the land, Prudential has not approved the land sales. See Appellant's Reply Br. at 3. Acequia concluded that Prudential was thereby throwing up a roadblock to its repayment of the debt.

While it may seem to a casual observer that Prudential's allocation method is designed merely to prolong Acequia's indebtedness, Prudential maintains that the Settlement Agreement did not permit it to apply the sale proceeds to Acequia's defaults. And Prudential seems to defend the Settlement Agreement as the only way to prevent Acequia from squandering the land--Prudential's only collateral--to meet immediate obligations and then running out of funds when remote principal payments start coming due. See Appellee's Br. at 13. Prudential also refutes Acequia's contention that the Settlement Agreement did not permit it to meet the demands for annual payments with the land sale proceeds. According to Prudential, Acequia was free to use any proceeds in excess of the Total Release Price of the land to meet its annual obligations. See Appellee's Br. at 25.

In order to determine whether Prudential has improperly applied the proceeds of the farm land sales, we must review the two provisions that arguably apply to this question. Section 4.01 of the Bankruptcy Plan, entitled "Sales of Land" states that "[t]he funds required to implement the Plan will be derived from rental income and from sales of land presently owned by the

Debtor." It then specifies that

As long as there remains unpaid any Interest Arrearage owed to Prudential as part of the Prudential Secured Claim, the entire amount of Net Proceeds from any sales of property subject to Prudential's mortgage will be paid over to Prudential and applied against the Interest Arrearage. . . . Once the Interest Arrearage has been satisfied . . . [p]ayments made to Prudential shall be applied first to unpaid accrued interest on the Prudential Note and then to principal.

Appellee's App., Tab 3 at 11-13.

On the other hand, the Settlement Agreement provides that:

The Total Release Price received by Prudential with respect to such sale shall be applied as follows: (x) the Release Value received with respect to such sale shall be applied against the Loan balance constituting a portion of, Segment A if the sale is of a parcel comprising a portion of Parcel A Property, or Segment B if the sale is of a parcel comprising a portion of Parcel B Property, and (y) the Release Interest Component received with respect to such sale shall be applied against the current and/or accrued interest (whether or not then due) allocable to the Loan balance being repaid under clause x above.

Appellee's App., Tab 1 at 5.

The district court reasoned that the Settlement Agreement provision was clear and unambiguous, and therefore, did not require an examination of the Bankruptcy Plan or extrinsic evidence to lend meaning to its provisions. Acequia now asserts that the district court erred by failing to apply the rules of contract interpretation recognized in Idaho, and therefore reached the wrong conclusion. Among the extrinsic evidence Acequia wanted the district court to consider was a Ninth Circuit opinion holding that the Settlement Agreement was not an impermissible modification of the Bankruptcy Plan. The other key extrinsic evidence was the fact that Acequia's 1995, 1996 and 1997 land sales required approval by the Bankruptcy Court. Acequia stated in its motions seeking approval of those sales that it intended to distribute the proceeds of sale "in accordance with the terms of the Plan and the Agreements between Acequia and Prudential in the same manner as contemplated by Section 4.01 of the Plan." Appellant's App., Tab L., Ex. 1, Paras. 2, 7. Prudential endorsed the sales, and the bankruptcy court authorized Acequia "to distribute the

proceeds of said sales as set forth in the Motion." Appellant's App., Tab L., Ex. 1, Paras. 5, 10.

The parties engage in some halfhearted back-and-forth about whether or not Acequia waived the choice of law issue by failing to cite Idaho caselaw in its pleadings below. But these pleadings cited few cases, and the district court did not cite a single case or explicitly identify whether it was applying Idaho or Illinois contract principles in analyzing the case. So there was no need for Acequia to press the issue at that stage. Additionally, the Settlement Agreement clearly states that Idaho law is to apply to any dispute arising under it. See Appellee's App., Tab 1 at 9. So we think Acequia may argue on appeal that the district court erred by failing to apply the Idaho rules of contract interpretation. However, it seems to us that Acequia is not really concerned so much with the court's choice of law as with the court's application of the rules of contract interpretation. The district court relied on the tried and true rule that if a contract is unambiguous, reference to extrinsic evidence is not permitted. See Appellee's App., Tab 4 at 5 (August 11, 1999 hearing on motion for summary judgment). The district court found the later document, the Settlement Agreement, unambiguous, and therefore did not rely on the earlier document or on extrinsic evidence to interpret the Settlement Agreement. But there were two agreements between these parties, and the subsequent contract did refer to, and in some provisions strive for consistency with, the first. In such a circumstance, we are willing to grant Acequia that an equally unexceptionable rule of contract interpretation--related documents must be read together--might have been applied before the court analyzed whether the contract at issue was ambiguous. See, e.g., Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir. 1995). One could argue that only after determining whether the two documents could be read together, or whether the latter superseded the former, could the court determine whether the resulting contract was ambiguous.

So the district court may have glossed over a nicety of contract interpretation. But even the Idaho law Acequia cites would not have altered the district court's conclusion that the second contract governed, and was unambiguous. According to the Idaho Supreme Court, "'a new contract with reference to the subject matter of a former one does not supersede the former and destroy its obligations, except in so far as the new one is inconsistent therewith, when it is evident from an inspection of the contracts and from an

examination of the circumstances that the parties did not intend the new contract to supersede the old, but intended it as supplementary thereto.'" Silver Syndicate, Inc. v. Sunshine Mining Co., 101 Idaho 226, 235 (1979) (emphasis added). In Silver Syndicate, two parties signed a mining contract in 1943, and a dispute later arose. The next year, they entered a second contract designed to settle the dispute. The 1944 contract specifically referred to the earlier contract, and specifically stated that it was meant to resolve uncertainties that the two parties had with respect to the first contract. The 1943 contract had created a 400-foot wide zone within which one party could mine another party's land. The court determined that because the 1944 contract referred to and relied on the 1943 contract, "it is clear that the parties did not intend to rescind it in its entirety." Silver Syndicate, 101 Idaho at 235. Because the 1943 and 1944 provisions did not contradict one another, both applied. The court concluded that reading both contracts together resulted in ambiguity regarding the parties' intentions about the 400-foot zone. The court therefore examined extrinsic evidence to determine the meaning of the contract. Acequia contends that the district court should have followed the same path in the present case.

But the present case is distinguishable from Silver Syndicate because the two documents here are contradictory and cannot be read together. Contradiction is found where terms in two documents cannot both be given effect. For instance, in Costello v. Watson, an early contract granted one party a 10 percent interest in land to be developed by the other party, and a later contract was silent about the 10 percent interest. 111 Idaho 68, 72 (Idaho App. Ct. 1986). The Idaho court did not find the two contracts contradictory, so it read them together. See id. In contrast, an Idaho bankruptcy court held that where an initial contract for the financed purchase of furniture did not create a purchase money security interest, and a subsequent contract for additional furniture did create a PMSI for both the earlier-purchased items and the later-purchased items, the later and contradictory agreement indicated "an intent to replace the prior [one]." In re Butler, 160 B.R. 155, 159 (D. Idaho 1993).

In the present case, the Settlement Agreement specifically refers to and relies on the Bankruptcy Plan. One provision specifies that mutual releases upon the closing of the settlement will be conducted in a method "consistent with the Plan." See Appellee's App., Tab 1 at 7. But reading the two together, it is

clear that as in In re Butler, the second contract, in the matter of applying land sales proceeds, contradicts the first and indicates an intent to replace it. The Bankruptcy Plan specified that proceeds of Acequia's land sales would be allocated first to the interest arrearage as of 1984, then to interest accrued thereafter and finally to principal. The Settlement Agreement takes a wholly inconsistent approach.

Recall that the Settlement Agreement essentially bundled the principal and interest owed as of 1989. The Settlement Agreement referred to that collective debt as the "loan," and the Amended Note referred to it as the "loan balance." Interest was then charged from 1989 forward on the collective debt known as the loan balance. The parties elected to apply different interest rates to the portion of the loan balance reflecting pre-1989 principal and to the portion reflecting pre-1989 interest. Therefore, the two components of the loan balance were labeled "Segment A" and "Segment B." All of Acequia's land parcels were assigned as security for either the Segment A or Segment B portion of the loan balance. The Settlement Agreement stated that the Total Release Price obtained for any parcel sold would be broken down into a Release Value Component and a Release Interest Component. The value component would be applied against either Segment A or Segment B, depending on the segment to which the parcel was assigned. And the interest component would be applied against the current and/or accrued interest allocable to the segment of the loan balance to which the property was assigned.

For example, if Acequia sold a parcel designated as security for Segment A (the pre-1989 principal), the release value portion of the sale price would be allocated against the pre-1989 principal, and the release interest portion of the sale price would be allocated against the post-1989 interest accrued or accruing on that pre-1989 principal. If Acequia sold a parcel designated as security for Segment B (pre-1989 interest), the release value portion of the sale price would be allocated against the pre-1989 interest, and the release interest portion of the sale price would be allocated against the post-1989 interest on that pre-1989 interest.

As we see it, the Settlement Agreement's complex and comprehensive scheme contradicts--and therefore revokes--the simple "interest arrearage, interest, principal" payment scheme called for in the Bankruptcy Plan. The two documents cannot stand together. Therefore, Silver Syndicate dictates that the Settlement

Agreement amounts to a partial rescission of the Bankruptcy Plan. Acequia maintains that the only purpose of the Settlement Agreement scheme is to differentiate between Segment A properties and Segment B properties, and that once a sold property is categorized as Segment A or Segment B, the proceeds of the sale must first pay down the interest on that segment of the loan before they can be used to pay down the principal. Acequia bolsters this argument by noting that the relevant provision of the Settlement Agreement does not refer to "principal" or "interest," and therefore cannot be said to change the "interest arrearage, interest, principal" hierarchy established in the Bankruptcy Plan. This interpretation ignores paragraphs 2, 8 and 9 of the Settlement Agreement. In those passages, the parties specified that Segment A represented pre-1989 principal and Segment B represented pre-1989 interest. When one plugs in "pre-1989 principal" or "pre-1989 interest" for "Segment A" or "Segment B," respectively, it becomes entirely clear that the Settlement Agreement contradicts the Bankruptcy Plan's "interest arrearage, interest, principal" hierarchy. The Settlement Agreement specifically calls for a portion of the proceeds of Segment A properties to be allocated to the pre-1989 principal (Segment A of the loan balance) at the same time as a portion of those proceeds are allocated to the post-1989 interest accruing on that principal. So the Settlement Agreement clearly does not require that all interest must be paid before any principal may be paid./1 Such a stark contradiction with the Bankruptcy Plan's provisions must be interpreted as a revocation. Therefore, the district court was ultimately correct that the Settlement Agreement, which could not be read together with the Plan, was unambiguous. The court correctly refused to examine extrinsic evidence. Prudential clearly followed the terms of the Settlement Agreement in applying the proceeds of the farm land sales.

Additionally, even if the district court should have examined the extrinsic evidence, we are not convinced it would have changed the outcome. First, Acequia seems to find persuasive an unpublished opinion in which the Ninth Circuit rejected the challenge of an equity security holder (a husband who split his shares with his co-owner wife after their divorce) to the adoption of the Settlement Agreement. See In re Acequia, Inc., 996 F.2d 1223 (9th Cir. 1993) (table), 1993 WL 219865. The husband filed a motion to terminate the Settlement Agreement, arguing that it constituted an impermissible modification of the Plan, in violation of section 1127 of the Bankruptcy Code. The court focused primarily on whether the extension of the

maturity date for the amended note, as called for in the Settlement Plan, was a modification. See id. at *2. The Bankruptcy Code permits changes to reorganization plans if the changes are designed to effectuate the plan. See id. But "modifications" of plans that are not meant to help implement the ultimate goals of the plan are not allowed. See id. Extending the maturity date of the note was necessary to effectuate the broad goals of the Plan, and was consistent with the plan, the court concluded. See id. Therefore, the court held, it was not an impermissible modification of the Plan. See id. The district court viewed the Ninth Circuit opinion as holding that the Settlement Agreement permissibly modified the Bankruptcy Plan, while Acequia viewed the opinion (along with the opinion of the district court that it affirmed) as holding that the Settlement Agreement did not change the Bankruptcy Plan. We don't think the Ninth Circuit opinion is relevant, regardless how it is interpreted. It dealt with the maturity date of the note, not the change in terms regarding allocation of land sale proceeds. And it applied rules derived from the Bankruptcy Code, not from Idaho contract law. So the Ninth Circuit opinion is not persuasive evidence that Section 4.01 was not modified.

We do not, by the way, think the Ninth Circuit opinion raises any issue preclusion problems. Issue preclusion occurs when, after an issue that was necessary to the outcome of a previous suit was fully litigated in that suit, a litigant tries to revive it in a separate suit involving a different party. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n.5 (1979). The Ninth Circuit resolved only the narrow question whether extension of the amended note's maturity date was such a wholesale modification that it violated the Bankruptcy Code. The determination of that issue did not bar the district court in the present case from deciding the very different question whether the Settlement Agreement's allocation of land sale proceeds was a rescission of Section 4.01 of the Bankruptcy Plan. Notably, no party in the present case has contended that the Settlement Agreement's modification of the Bankruptcy Plan's land sale allocation scheme amounts to an impermissible modification under the Bankruptcy Code. Instead, the parties save their fire for the common-law issue of whether Prudential breached the terms of the parties' contract by applying the proceeds as it did.

Acequia also offers as evidence its motions asking the Bankruptcy Court to approve the 1995, 1996 and 1997 land sales. In those motions, it stated that it intended to distribute the proceeds of sale "in accordance with the terms of the Plan and the Agreements between Acequia and

Prudential in the same manner as contemplated by Section 4.01 of the Plan." Appellant's App., Tab L., Ex. 1, Paras. 2, 7. Prudential endorsed the sales, and the bankruptcy court authorized Acequia "to distribute the proceeds of said sales as set forth in the Motion." Appellant's App., Tab L., Ex. 1, Paras. 5, 10. Therefore, Acequia argues, both the Bankruptcy Court and Prudential agreed with the proposition that even after the Settlement Agreement was executed, the Plan provisions for allocating land sale proceeds still applied. We do not take that view. First, the motion specifically refers to both the Plan and the Agreement, suggesting that the Plan provisions no longer stood alone. Second, while all parties appeared to agree in these documents that Acequia would turn over the money to Prudential according to the dictates of Section 4.01, the documents do not specifically state that Prudential will allocate the money to the various segments of the indebtedness as called for in Section 4.01.

Finally, Acequia offers us the opinion of an Idaho magistrate judge ruling in a parallel foreclosure suit pending in Idaho. The magistrate judge denied Acequia's motion for summary judgment in the Idaho action, reasoning that it was unclear how the changes incorporated in the Settlement Agreement affected the integrity of the Plan, and concluding that "[t]hese types of issues are best resolved at trial." See Appellant's Br. at 24. As the district court correctly noted, its grant of summary judgment preceded the Idaho magistrate judge's recommendation. Therefore the magistrate judge's recommendation is in no way binding. Moreover, it is instructive that because Acequia was the party moving for summary judgment, the Idaho magistrate judge's recommendation essentially rejected Acequia's position that the Settlement Agreement, as a matter of law, did not rescind Section 4.01 of the Bankruptcy Plan. So in reality, the magistrate judge's recommendation is not an endorsement of Acequia's position, and therefore is not persuasive as extrinsic evidence of how the two contracts should be synthesized.

II. Grant of Summary Judgment

Having determined that Prudential's accounting method was sound, the district court granted summary judgment for Prudential on all of its claims. Prudential's motion for summary judgment requested that the court grant summary judgment "on the accounting issues arising from and alleged in each claim for relief in Acequia's Second Amended Complaint." This is a slightly odd request for summary judgment, in that it does not specifically request relief on any particular

claim, and appears to stop short of specifically requesting relief on all the claims.

A district court is permitted to enter summary judgment sua sponte if the losing party has proper notice that the court is considering granting summary judgment and the losing party has a fair opportunity to present evidence in opposition. Simpson v. Merchants Recovery Bureau, 171 F.3d 546, 549 (7th Cir. 1999). For instance, in Simpson, we held that the district court improperly granted summary judgment for a defendant. In that case, the plaintiff verbally mentioned during a conference with the opponent and the judge that she might amend her complaint to outline a different theory against the defendant. The court asked both sides to submit cases on the new theory, and the defendant submitted a detailed statement of facts, legal argument, affidavits and exhibits. Based on this filing, the district court entered summary judgment in favor of the defendant. We concluded that the plaintiff had no notice summary judgment was under consideration, and therefore the court erred in granting it. In contrast, we have stated that where one defendant succeeds in winning summary judgment on a ground common to several defendants, the district court may also grant judgment to the non-moving defendants, if the plaintiff had an adequate opportunity to argue in opposition. See Malak v. Associated Physicians, Inc., 784 F.2d 277, 280 (7th Cir. 1986).

In the present case, seven of Acequia's eight claims, namely breach of contract, breach of duty of good faith, tortious interference, interference with the business advantage, defamation, disparagement of commercial business and violation of the Illinois Consumer Fraud Act, rely explicitly on the allegation that Prudential misapplied to principal Acequia payments that should have been devoted to interest. Acequia alleges that Prudential thereby drove up the Total Release Price required for the land, and obstructed Acequia's business, giving rise to the breach of contract, breach of duty of good faith, tortious interference, interference with business advantage and Illinois Consumer Fraud Act claims. Relatedly, Acequia alleges that Prudential informed third parties that Acequia had defaulted on its obligations, giving rise to the defamation and disparagement of commercial business claims. So, if Prudential properly applied the funds, then it was entitled to a higher release price on the land, and was correct in telling third parties that Acequia had defaulted. Therefore, resolution of the accounting issue in Prudential's favor inevitably meant that Acequia would lose on those seven counts. While the motion for summary judgment did not explicitly

request relief on the seven counts, the obvious inference was that success on the "accounting issue" would amount to success on those seven counts. For this reason, we are not sure we can characterize the district court's grant of summary judgment on those counts as a sua sponte grant of summary judgment. The court was--albeit indirectly--asked to grant summary judgment on those counts.

Moreover, even if we were to say this grant of summary judgment was sua sponte, we do not think it was improper. Acequia, the losing party, had proper notice that the court was being asked to consider the accounting issue, and should have known based on its familiarity with the complaint that a ruling favorable to Prudential would spell doom for seven of its eight claims. Malak states that a holding common to all defendants may result in summary judgment for all defendants, even if fewer than all of them moved for summary judgment. In the present case, the district court reached a holding common to seven of Acequia's claims, and even though Prudential did not explicitly request summary judgment on all seven claims, the district court merely reasoned logically in stating that the common holding defeated the seven claims. Further, as required in Simpson and Malak, Acequia had an ample opportunity to present evidence on the accounting issue. Not only did it submit memoranda of law and affidavits from its officers explaining their understanding of the Settlement Agreement's terms, Acequia's attorney engaged in a lengthy colloquy with Judge Bucklo in which the attorney was allowed to develop her contractual theory. So both requirements were met for entry of summary judgment sua sponte. See Simpson, 171 F.3d at 549.

The single count that does not depend explicitly on the outcome of the accounting issue is the fraud count, in which Acequia alleges that Prudential misrepresented the import of the Bankruptcy Plan and the Settlement Agreement, intending all the while to apply the funds so as to drive up the accrued interest and block Acequia's land sales. At the hearing in which the district court indicated it would grant summary judgment for Prudential on every count, Acequia maintained that the fraud claim was independent of the accounting issue and therefore inappropriate for summary judgment. The trial court expressed skepticism about the viability of the fraud claim, noting that Acequia could not have been defrauded by Prudential's verbal representations if the contract clearly spelled out how land sale proceeds were to be accounted for. Nevertheless, the court gave Acequia two days to submit authority for the proposition that

Prudential's verbal assurances amounted to fraud. So Acequia had notice that summary judgment was under consideration, as required by Simpson. Despite this notice, Acequia submitted nothing.

Moreover, the court sent the case back to the magistrate judge for further confirmation that no outstanding accounting issues remained. Though the court did not expressly give Acequia the opportunity to re-argue its fraud position to the magistrate judge, the fact remains that the district court did not hastily enter the summary judgment against Acequia. Acequia knew that the district court planned to enter summary judgment at the conclusion of the magistrate's review, and did not take advantage of its opportunity to persuade the district court or the magistrate judge that summary resolution of the fraud claim was ill-considered.

Acequia complains that because the magistrate judge had limited discovery to the accounting issue, it was not able to point to a genuine issue of material fact to preclude the entry of summary judgment on the fraud count. Under other circumstances, this might violate the requirement of Simpson that the losing party have an opportunity to present evidence favorable to its position. But the trial court clearly indicated that if Acequia could show as a matter of law that it might prevail on the fraud count under the facts it alleged, the court would hold off on summary judgment and let Acequia develop further evidence. So Acequia's hands were not tied by the lack of evidence available to it.

In sum, we think the district court was ultimately correct that Prudential properly applied the proceeds of the farm land sales to either interest or principal, as called for in the Settlement Agreement, and we Affirm that decision. We also think the trial court acted properly in granting summary judgment on all eight claims, and Affirm that decision as well.

/1 This is so regardless whether one defines "principal" as the principal that had accumulated as of the 1989 Settlement Agreement (Acequia's preference) or as the entire $4.5 million designated the "loan balance" in the 1989 Promissory Note (the district court's preference). Under either definition, when a Segment A parcel is sold, principal will be paid contemporaneously with interest. The only time the definition will make a difference is when a Segment B parcel is sold. If one defines "principal" only as pre-1989 principal, then paying down the pre-1989 interest represented by

Segment B constitutes an interest payment, whereas if one defines "principal" as pre-1989 principal and interest, then paying down the pre-1989 interest represented by Segment B constitutes a principal payment. This distinction is not relevant, however, because the fact remains that the Settlement Agreement specifically calls for the pre-1989 principal-- which both parties agree is properly defined as principal--to be paid simultaneous with interest. So regardless how one defines "principal" under the Settlement Agreement, the Agreement abrogates the Bankruptcy Plan's "interest arrearage, interest, principal" hierarchy.