In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3596

JOHN ELLIS, TIMOTHY PRICE, and
all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

DHL EXPRESS INC. (USA) and
DEUTSCHE POST AG, formerly known as
DEUTSCHE POST WORLD NET,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 06541—**Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 9, 2010—DECIDED JANUARY 11, 2011

Before WOOD, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Package delivery service DHL
Express and its German parent company, Deutsche Post
AG, publicly announced on November 10, 2008, that
they would stop offering U.S. domestic shipping on
January 30, 2009. This announcement effectively sounded

the death knell for five of DHL's six Chicagoland facilities, which handled domestic parcels almost exclusively and had been shedding jobs since August. The union that represented the drivers and clerical workers at those facilities, the International Brotherhood of Teamsters Local 705, immediately began talks with DHL to negotiate severance agreements for its members. (The collective bargaining agreements that covered the workers did not provide for severance benefits.) The negotiations were successful and on December 5, 2008, yielded a severance agreement for each bargaining unit, the drivers and the office workers. The agreements became operative on December 9, 2008, when DHL's representative signed them. Whether DHL violated the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-2109, in reaching and implementing these agreements is the principal question before us in this appeal.

The agreements contained a number of different severance benefits packages. The first was available to up to 325 of DHL's full-time drivers. Drivers who opted (and qualified on seniority grounds) for this package would receive ten weeks of pay and benefits. Drivers had little time to decide whether to participate in this plan; they were simultaneously required to complete a job rebid form on which they had to indicate by the close of business on December 11, 2008, not only their future shift preferences but also whether they had signed up for the ten-week plan. The other severance packages Local 705 negotiated provided four rather than ten weeks of pay and benefits but were otherwise substantially

similar to the ten-week plan. There were no limits placed upon the number of workers who could enroll in the four-week plans, though one of the packages for each bargaining unit was aimed exclusively at individuals who had already been laid off (these packages provided no benefits), and the others were aimed at workers who remained on staff. Drivers and already-laid-off office workers were given until December 22, 2008, to decide whether they wanted to participate in the four-week plans. Employed office workers appear to have been given until January 18, 2009, to make their decisions.

Workers who accepted any of the Local 705-negotiated severance packages signed the following "General Waiver and Release":

> For and in consideration of the receipt of the Severance Payment and other benefits provided in the Effects Bargaining Agreement (which I acknowledge are payments and benefits beyond anything to which I am already or otherwise entitled), I hereby waive, release and discharge DHL Express (USA), Inc., its parent corporation, subsidiaries, related corporations and affiliates, their successors and assigns, and their shareholders, officers, directors, employees and agents (hereinafter together the "Company"), and the Teamsters Local Union No. 705, affiliated with the International Brotherhood of Teamsters (hereinafter the "Union") from any and all actions, causes of action, demands, claims or liabilities (whether

known or unknown) arising out of my employment or the termination of my employment by the Company, including but not limited to any claims under any federal, state, or local law concerning employment rights or employment discrimination of any type, including the National Labor Relations Act, the Illinois Worker Adjustment and Retraining Notification Act, the Federal Worker Adjustment and Retraining Notification (WARN) Act, and laws involving claims of discrimination based on race, sex, religion, national origin, disability, veteran's status, union activity, marital status, retaliation, harassment or other protected categories, claims for breach of any implied or express employment contracts or covenants, claims for wrongful termination, public policy violations, defamation, emotional distress or other common law torts, or claims under any Collective Bargaining Agreement, Supplemental Agreement, Memorandum of Understanding (MOU), or any other agreement between the Company and the Union. I further understand that by accepting the Severance Payment, I am giving up my employment relationship with the Company, including any recall rights and seniority. . . .

I acknowledge that I have been and am in this document advised in writing to consult an attorney before executing this General Release and that the foregoing shall operate as a general release and as a promise not to sue, and that I have read and understand this General Release. I acknowl-

> edge I have received seven (7) days to consider this General Release before signing it, and I understand that I have seven (7) days to revoke it after I sign it.

A total of 506 workers (some of them were members of Automobile Mechanics Union Local 701, which negotiated its own similar four-week plan) signed a release and resigned their employment in exchange for either four or ten weeks of severance pay and benefits. Three hundred nineteen drivers took the ten-week plan, while 187 workers participated in one of the three four-week plans.

Workers who did not participate in one of the union-negotiated severance plans did not receive any severance pay from DHL. Those individuals instead retained their seniority status and recall rights, as well as the right to bring legal claims against DHL and its parent, Deutsche Post. John Ellis and Timothy Price, the named plaintiffs in this putative class action, were DHL drivers and Local 705 members who did not participate in the union-negotiated plans. Ellis, who was laid off days before the discontinuation of domestic shipping was announced, and Price, who was laid off on January 9, 2009, instead filed suit, alleging that DHL and its parent Deutsche Post failed to comply with the WARN Act, which requires certain businesses contemplating "plant closings" or "mass layoffs" to inform workers of these impending events at least sixty days in advance. Ellis and Price sought back pay and benefits. *See* 29 U.S.C. § 2104. They also sought to represent a class of

former DHL employees who had been represented by Local 705, but the district court terminated as moot their motion to certify a class after granting in full DHL's motion for summary judgment. *See Muro v. Target Corp.*, 580 F.3d 485, 494 (7th Cir. 2009).

The district court provided three interrelated bases for its grant of summary judgment, all of which led it to the conclusion that the WARN Act was not applicable here. First, the district court concluded that the DHL lay-offs could not constitute a "plant closing" as defined in 29 U.S.C. § 2101(a)(2) because the five Chicagoland facilities could not together be considered a "single site of employment," and Price and Ellis failed to put forth allegations sufficient to raise a genuine issue of material fact as to whether a "plant closing" occurred at any of the individual facilities. Second, the district court concluded that the layoffs could not constitute a "mass layoff" as defined in 29 U.S.C. § 2101(a)(3) because the employment losses at the five facilities (considered collectively for the sake of argument) did not reach the requisite critical mass of 33% of the full-time work-force during the relevant statutory time period. Finally, the district court determined that Ellis and Price failed to raise a genuine issue of material fact regarding the voluntariness of the union-negotiated severance agreements, fatally undermining their contention that the workers who left DHL pursuant to those agreements should be counted as involuntarily separated for WARN Act purposes. *See* 29 U.S.C. § 2101(a)(6); 54 Fed. Reg. 16042, 16048 (Apr. 20, 1989). The district court recognized that the DHL workers had to make a tough choice in

the face of daunting economic circumstances, but concluded that there was no evidence that they signed the severance agreements involuntarily. Because it found that the bases for its grant of summary judgment in favor of DHL applied equally to Deutsche Post, against whom Ellis and Price levied identical claims, the district court sua sponte granted summary judgment in favor of Deutsche Post as well and terminated the case. Ellis and Price appeal the grants of summary judgment.

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The WARN Act requires "employers" (defined as businesses with 100 or more full-time employees, 29 U.S.C. § 2101(a)(1)) to provide employees with written notice of impending "plant closings" or "mass layoffs" at least sixty days prior to the closing or layoffs. 29 U.S.C. § 2102. The WARN Act does not apply—and the employer need not provide advance notice to any of its workers—if the shutdown of a plant does not result in an employment loss of at least 50 full-time employees at a single site of employment, 29 U.S.C. § 2101(a)(2), or the layoffs do not affect at least 33% of full-time employees, 29 U.S.C. § 2101(a)(3). Despite the lack of practical distinction between eliminating 49 or 50 full-

time jobs, or between laying off 32% or 33% of a work-force in a thirty-day period, the numerical thresholds in the WARN Act are immutable. *See Phason v. Meridian Rail Corp.*, 479 F.3d 527, 530 (7th Cir. 2007) ("The [WARN Act] draws a lot of bright lines; it is really nothing *but* lines. . . . None of these distinctions is inevitable; all are arbitrary. But using sharp lines makes the Act easier to administer."). If an employer crosses one of them without providing affected employees the requisite notice, it is liable to provide "each aggrieved employee" with back pay and benefits for each day that the WARN Act was violated. 29 U.S.C. § 2104. That is why the 506 departures pursuant to the union-negotiated severance agreements are crucial here: if those workers are counted in the total number of affected employees, DHL may have overstepped one of WARN's lines. If they are not counted, however, DHL is in the clear; Ellis and Price explicitly conceded this point twice at oral argument. We therefore begin and end our analysis by examining the voluntariness issue, as it is dispositive. *See Spivey*, 622 F.3d at 822.

The WARN Act excludes "voluntary departure[s]" from its definition of "employment loss[es]" that trigger its notification requirements. 29 U.S.C. § 2101(a)(6). The WARN Act does not provide a definition of "voluntary," though it authorizes the Secretary of Labor to issue "such regulations as may be necessary to carry out this chapter." 29 U.S.C. § 2107(a). Before enacting the regulations currently codified at 20 C.F.R. §§ 639.1-639.10, the Secretary in the *Federal Register* addressed public comments. *See* 54 Fed. Reg. 16042 (Apr. 20, 1989). In

doing so, the Secretary clarified the Department of Labor's position on "what constitutes a 'voluntary departure.'" *Id.* at 16048. We give significant weight to these interpretations. *See United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001) ("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and [w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." (quotations omitted)); *see also Johnson v. Telespectrum Worldwide, Inc.*, 29 F. App'x 76, 78 (3d Cir. 2002) (giving weight to the very interpretations at issue here).

The Secretary explained that "incentive programs, including incentive retirement programs and voluntary layoffs" should typically be considered voluntary departures within the meaning of the WARN Act so long as the circumstances surrounding them comport with traditional legal notions of voluntariness. 54 Fed. Reg. at 16048. That is, "a worker's resignation or retirement may be found to not be voluntary if the employer has created a hostile or intolerable work environment or has applied other forms of pressure or coercion which forced the employee to quit or resign," or "where a worker was unduly pressured to accept the program." *Id.* The Secretary expressly disagreed with the proposition that "a worker who, after the announcement of a plant closing or mass layoff, decides to leave early has necessarily been constructively discharged or quit 'involuntarily.'" *Id.* In other words, worker participation

in incentive programs is generally considered voluntary unless the employer improperly induced workers to leave their jobs, either by creating a hostile or intolerable work environment or by applying other forms of undue pressure or coercion.

We have not previously addressed the issue of voluntariness in the WARN Act context, though we have considered the voluntariness of early retirement offers. In that analogous context, we explained,

> The "voluntariness" question . . . turns on such things as: did the person receive information about what would happen in response to the choice? was the choice free from fraud or other misconduct? did the person have an opportunity to say no? A very short period to make a complex choice may show that the person could not digest the information necessary to the decision. This would show that the offer of information was illusory and there was no informed choice. But when the employee has time to consult spouse and financial adviser, the fact that he still found the decision hard cannot be decisive.

*Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828-29 (7th Cir. 1987). The arguments raised by Ellis and Price echo these very concerns. Ellis and Price contend that the resignations, particularly those of the already-laid-off workers, cannot be considered voluntary because the employees resigned against a backdrop of extreme economic uncertainty and pressure exerted by DHL. They emphasize that the drivers were simultaneously

presented with the severance agreements and the job rebid forms, which in their view rendered any choice they had about signing up for one of the severance packages a Hobson's choice at best. They also contend that the 319 drivers who accepted the ten-week plan had inadequate time to make their decisions. With respect to the already-laid-off workers who accepted the four-week packages aimed at them, Ellis and Price assert that their resignations could not possibly have been voluntary because they did not have jobs to resign from.

While we recognize the unenviable positions in which DHL's Chicagoland workers found themselves, we are unpersuaded by these arguments and cannot conclude on the evidence before us that the workers who accepted the union-negotiated severance packages did so involuntarily. The affidavits of former DHL employees that Ellis and Price present paint a wrenching picture of a difficult decision that had to be made quickly. But they do not demonstrate that the workers were given incomplete information, or that DHL somehow strong-armed them into signing the release forms and accepting the severance packages against their will. (Indeed, Ellis and Price expressly disclaim any arguments that DHL harassed workers or created a hostile work environment to induce them to resign.) To the contrary, several affiants testified that their managers declined to discuss the options with them. *Cf. Henn*, 819 F.2d at 829 (observing that employer's unwillingness to advise potential early retirees whether to accept an early retirement offer was probably due to a desire to "avoid charges of placing undue pressure on the employees"). The severance agreements and the General

Waiver and Release were both negotiated by Local 705 with the workers' interests in mind, and were written unambiguously in plain English. The General Waiver and Release also expressly advised workers to consult an attorney before signing, as did a letter that Local 705 sent to the already-laid-off workers.

We appreciate that two business days may not have been an expansive window in which to fully discuss matters with an attorney. *But see Joe v. First Bank Sys., Inc.*, 202 F.3d 1067, 1070 (8th Cir. 2000) (noting that a WARN Act plaintiff "presented no meaningful proof of duress" which was "not surprising since [he] had the release for two or three days and discussed it with his attorney"). Yet "the need to make a decision in a short time, under pressure, is an unusual definition of 'involuntary.'" *Henn*, 819 F.2d at 828. Indeed, many criminal defendants must decide whether to sign take-it-or-leave-it plea agreements; "the need to act in haste does not make the plea 'involuntary' if the defendant knows and accepts the terms of the offer." *Id.* Of course, criminal defendants are afforded proce-dural safeguards to ensure that their decisions truly are voluntary. *See* Fed. R. Crim. P. 11. The workers here were not required to have their decisions evaluated by an impartial judge, but neither is there any evidence that DHL denied them the opportunity to educate them-selves about their options or to discuss the terms of the offers with their families, friends, financial advisors, or attorneys. Moreover, the workers who were con-sidering the ten-week package had not two days but nine in which to do so; the General Waiver and Release

gave workers seven days after accepting a severance package in which to reconsider and revoke their acceptance. That the workers had to decide whether to take the bird in the hand—the severance packages—or the bird in the bush—the right to retain their seniority rank, remain on the recall rolls for three years, and pursue claims against DHL—in a short period of time does not render their decisions involuntary. Nor does the fact that neither bird was particularly attractive.

Ellis and Price's final argument about the voluntariness of the departures—that the already-laid-off workers could not leave DHL voluntarily because they had no jobs to leave from—gets them no further. Their position presupposes that the already-laid-off workers lost their attachment to DHL the moment they were laid off. The record shows, and Ellis and Price acknowledged at oral argument, that laid-off workers retained their hard-earned seniority status and recall rights with DHL for up to three years. If the laid-off workers elected to sign the General Waiver and Release in exchange for the severance package, they gave up those potentially valuable rights and fully cut their ties with DHL. They may not have been walking away from specific positions, but they were electing to end their relationships with DHL rather than waiting around for three years to see if new opportunities came to fruition.

In offering its workers the olive branch of severance pay, DHL was hedging its bets against WARN Act liability. Employers are permitted to "gamble" that enough

workers accept their proffered incentive packages to absolve them from potential WARN Act liability, 54 Fed. Reg. at 16043, and DHL successfully tossed the dice here. Ellis and Price are in effect asking us to prohibit such behavior, but we cannot rewrite the WARN Act. We likewise decline their invitation to treat the WARN Act less like the notification procedure that it is and more like the universally applicable Fair Labor Standards Act and Older Workers Benefit Protection Act that it is not. That is, we maintain our previous stance that WARN Act claims can be waived as part of a voluntarily signed general release. *See Hardy v. Chi. Hous. Auth.*, 189 F. App'x. 510, 512 (7th Cir. 2006) (citing *Joe*, 202 F.3d at 1070, and *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion*, 199 F.3d 796, 799 (5th Cir. 2000)).

We are left with only one issue to resolve: whether the district court erred in sua sponte granting summary judgment to Deutsche Post. Recall that Ellis and Price brought WARN Act claims against both DHL and its parent, and only DHL moved for summary judgment. The district court, reasoning that if Ellis and Price could not prevail against one defendant they could not prevail against its alleged alter ego, granted summary judgment to both companies. Ellis and Price contend that because they had limited opportunity to conduct discovery with respect to Deutsche Post (it is based in Germany and there was significant delay in serving it with process and bringing it into the case), summary judgment was inappropriately granted.

District courts have the authority to enter summary judgment sua sponte as long as the losing party was on notice that it had to come forward with all its evidence. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384 (7th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). "In addition, we have held that if a district court grants one defendant's motion for summary judgment, it may sua sponte enter summary judgment in favor of non-moving defendants if granting the motion would bar the claim against those non-moving defendants." *Id.* (citing *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986)); *see also Acequia, Inc. v. Prudential Ins. Co. of Am.*, 226 F.3d 798, 807 (7th Cir. 2000) ("[W]here one defendant succeeds in winning summary judgment on a ground common to several defendants, the district court may also grant judgment to the non-moving defendants, if the plaintiff had an adequate opportunity to argue in opposition.").

The district court did not overstep its authority here. All of Ellis and Price's substantive allegations implicate both DHL and Deutsche Post; their first amended complaint even alleges that Deutsche Post was "at all times . . . the alter ego of DHL Express and maintains strict control over DHL Express." First Am. Compl. ¶ 4. When the district court correctly concluded that summary judgment for DHL was appropriate, the necessary implication was that the identical claims against Deutsche Post could not succeed either. Whether the departures were voluntary, whether there was a "plant closing," and whether there was a "mass layoff" are issues that

were wholly unaffected by the precise corporate identity of the defendant. Further, Ellis and Price had ample notice that DHL was pursuing summary judgment on the claims that were common to both defendants, and they vigorously opposed the motion by procuring and coming forward with hundreds of pages of documents and declarations. The district court's grant of summary judgment in favor of both defendants is AFFIRMED.