CLEVELAND HAIR CLINIC, INC., an Ohio corporation, Plaintiff–Appellee,

v.

Carlos J. PUIG and Puig Medical Group, S.C., an Illinois corporation, Defendants.

Appeal of: Michael L. Tinaglia and Dimonte, Schostok & Lizak

No. 99–1417.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1999.

Decided Jan. 10, 2000.

Order Supplementing Opinion Feb. 4, 2000.

Jerome H. Torshen (argued), Zoran Dragutinovich, Torshen, Spreyer, Garmisa & Slobig, Chicago, IL, for Appellants.

Before RIPPLE, MANION, and EVANS, Circuit Judges.

TERRENCE T. EVANS, Circuit Judge.

People often get in hot water not so much for the original misdeed, but for the cover up. That's certainly the case with Chicago attorney Michael L. Tinaglia. It was not Tinaglia's attempt to sneak around the federal court into state court that got him into trouble, but rather his failure to come clean about that scheme when talking to a federal judge. And that's a shame, for it seems that Tinaglia, a lawyer since 1977 with a spotless record, let his competitive juices get the better of his judgment in the summer of 1996.

Tinaglia represented Carlos J. Puig, a doctor who tried to commandeer the Cleveland Hair Clinic (CHC), with whom Puig had a long-standing contract to perform hair transplants.[1] CHC is an Ohio corporation that has several hair transplant clinics nationwide, the most profitable of which is in the Chicago suburb of Rosemont. Taking most of the clinic's other hair transplant doctors with him, Puig terminated his contract with CHC in May 1996. The next month CHC went to federal court (under diversity jurisdiction) and accused Puig of breaching the contract and violating his fiduciary duties as a CHC officer and shareholder. A few days later Puig sought a temporary restraining order to gain control of the patients' medical records. On June 12 the district court denied Puig's TRO motion but scheduled a preliminary injunction hearing for July 8.

Based on the adverse TRO ruling and his perception that the district judge was not fond of him, Tinaglia thought the chances of winning access to the medical records in federal court were slim. Tinag-

Jurgis Kins, Abramson & Fox, Chicago, IL, for Carlos J. Puig and Puig Medical Group.

Thomas F. Ging, Hinshaw & Culbertson, Chicago, IL, for Rodney Haenschen.

---

1. CHC's latest, most cutting-edge hair transplant procedure is the "Brandy Flap," in which a patient's hair-bearing skin is stretched over portions of his bald area. *See Cleveland Hair Clinic, Inc. v. Puig,* 968 F.Supp. 1227, 1233 (N.D.Ill.1996).

lia and Puig decided instead to try to get the records through a state court. Instead of Puig, the plaintiff in the state action would be Rodney Haenschen, who had not been named as a defendant in the federal case even though he worked for Puig, was in cahoots with Puig in the attempted coup d'etat, and was the main man in the Rosemont office. Instead of CHC, the defendant in the state action would be Richard Malmin, CHC's manager in Rosemont. And instead of Tinaglia, the attorney of record in the state case would be Joseph Curcio, a friend of Tinaglia's.

CHC got wind of this plot and on the morning of July 1 filed in federal court an emergency motion to add Haenschen as a defendant in the federal case and to enjoin him from filing claims anywhere other than in the federal district court. The district court, Judge Milton I. Shadur, scheduled a hearing on the motion for 1 p.m. that day.

Things got hairy when Tinaglia received CHC's motion at 11:30 a.m. Telephone and fax records indicate he immediately paged Haenschen, who called Tinaglia back. Haenschen then rushed from the Taste of Chicago, a summer festival, to Curcio's office, where he signed blank papers onto which the state lawsuit later was transplanted. This was the first time that Haenschen and Curcio had met; Tinaglia and his law firm, DiMonte, Schostok & Lizak, had drafted all of the papers for Haenschen's state action. A fax from Tinaglia to Curcio of a revised version of the state complaint went through at 12:49 p.m. In an attempt to beat the federal court to the punch, Curcio then hotfooted it over to the Daley Building, where he filed Haenschen's state complaint at 1:17 p.m. and filed an emergency motion for a temporary restraining order at 1:32 p.m. (Tinaglia was not as adept at covering his tracks as Puig and Haenschen were in covering their patients' bald spots—telephone records showed exactly when Tinaglia had contact with Haenschen and Curcio, and the complaint Curcio filed in state court still carried the line at the top indicating that Tinaglia's law firm had faxed the documents to Curcio.)

A few blocks away at the federal courthouse, the hearing regarding CHC's emergency motion got under way at 1 p.m. CHC's attorneys were in Judge Shadur's courtroom; Tinaglia was on the telephone. Some excerpts from that hearing follow:

TINAGLIA: And for the record, your Honor, I represent defendant Puig and the professional corporation, Puig Medical Group. I don't represent anybody else.

\* \* \*

JUDGE SHADUR: Now, Mr. Tinaglia, I do understand that you are representing, of course, only the two defendants in the case. But my added question of you is whether, to your knowledge, if Mr. Haenschen were to be added, you would expect to be representing him as well?

TINAGLIA: The answer is, no, Judge. In fact, I specifically advised— this issue came up with respect to the deposition of Dr. Haenschen that the parties—that the plaintiffs noticed up. And I communicated by letter to them yesterday that I don't represent Dr. Haenschen. And I am—you know, I am again reiterating that in the presence of the Court.

\* \* \*

JUDGE SHADUR: Let me ask Mr. Tinaglia, although I understand you are not representing him, maybe you can simply apprise me of whether you have heard from Dr. Haenschen since, as counsel has just indicated, notice was given to him of their coming in on this emergency matter?

TINAGLIA: Judge, I—first of all, I received the fax from counsel at 11:30, and I represent to counsel and to the Court that I haven't—I haven't spoken to Rodney Haenschen at all since that notice. And in fact, I haven't talked to him today.

CHC ATTORNEY ALAN S. RUTKOFF: I am wondering though, your Honor, if counsel could be asked whether he knows whether Mr. Haenschen has a lawyer. I think that was—that would be responsive to what would help us.

JUDGE SHADUR: You heard that question. I think that's a reasonable inquiry as well. Are you aware of whether Dr. Haenschen does or does not have counsel that he has either conferred with or retained?

TINAGLIA: The last time I spoke to Dr. Haenschen was over the weekend. And I advised him that I didn't think it appropriate for me to represent both Dr. Puig and the professional corporation and Dr. Haenschen in a manner with respect to this—well, the litigation before your Honor. He—in my conversation with him, you know, I mean, for what it's worth, he said, okay, I understand. He says, you know, he's kind of on his own.

In short, at the July 1 hearing Tinaglia said he was not representing Haenschen, said he had not spoken to Haenschen that day, said nothing about Curcio's "representation" of Haenschen, and said nothing about the state complaint Tinaglia drafted for Haenschen that was simultaneously being filed by Curcio.

Tinaglia and his clients' prospects for success receded almost as quickly as the hairlines of CHC's customers. CHC found out about the state complaint (which went nowhere) and sought sanctions. After a 6–day evidentiary hearing Judge Shadur concluded that Tinaglia, Tinaglia's law firm, Puig, the Puig Medical Group, and Haenschen all had engaged in sanctionable conduct and were jointly and severally liable for CHC's legal expenses.[2]

Calculating CHC's legal costs was done in two phases. In the first round CHC, Puig and Haenschen stipulated that CHC had incurred at least $174,121 in legal expenses as a result of the misconduct but could not agree on whether additional expenses had been incurred. Tinaglia refused to participate in this process and instead filed two appeals that were dismissed for lack of a final judgment. *See Cleveland Hair Clinic, Inc. v. Puig*, 104 F.3d 123 (7th Cir.1997); *Cleveland Hair Clinic, Inc. v. Puig*, 106 F.3d 165 (7th Cir.1997). In the second round CHC and Tinaglia stipulated that—if sanctionable conduct occurred—CHC had sustained an additional $85,000 in consequent legal costs. In total, Puig paid $60,777.50 in sanctions, Haenschen paid $15,000, and Tinaglia paid $185,143.53, including $183,343.50 for CHC attorneys fees and a $1,800.03 fine for contempt of court.[3]

Tinaglia now appeals that sanction, arguing that he did nothing sanctionable and, alternatively, that if he committed sanctionable conduct, the size of the sanction is excessive.

■ A district court's imposition of sanctions is reviewed for abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (sanctions under the court's inherent power); *Fox Valley Constr. Workers Fringe Benefit Funds v. Pride of Fox Masonry and Expert Restorations*, 140 F.3d 661, 666 (7th Cir.1998) (sanctions under 28 U.S.C. § 1927). This court rarely will disturb a district judge's reasoned decision to choose a particular level of sanctions. *Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 534 (7th Cir. 1998).

---

**2.** The details of what happened in the underlying litigation are largely irrelevant to this appeal, but CHC was granted partial summary judgment, *Cleveland Hair Clinic, Inc. v. Puig*, 949 F.Supp.595 (N.D.Ill.1996); the district court enjoined Puig from violating the original agreement with CHC, *Cleveland Hair Clinic*, 968 F.Supp. 1227; Puig ended up in bankruptcy; and the underlying dispute ultimately was settled.

**3.** When Tinaglia balked at paying the first part of the sanctions Judge Shadur found him in contempt and imposed a $300 fine per day until payment was made.

Tinaglia claims he did not literally lie to the court when he told Judge Shadur that he was not representing Haenschen because he says he meant that he was not representing Haenschen in the *instant federal* case. Such hairsplitting may be appropriate for a transplant surgeon, but not for an attorney. First, it is hard to believe that Tinaglia was not representing Haenschen in the federal case on July 1 when Tinaglia did represent Haenschen at his deposition in the federal case on July 5. Second, there was no great divide between the state and federal cases. Tinaglia had been working hand in glove with Puig and Haenschen to try to get, in state court, the exact same records that Puig failed to get in federal court. Tinaglia concedes on appeal that he was representing Haenschen at the time in the state case. We accept that Tinaglia was referring only to the federal case when he entered his appearance on behalf of Puig, but the whole point of the emergency federal hearing was to determine what might be happening in state court, and Judge Shadur's follow-up questions were attempting to determine whether Haenschen was represented in any capacity. Tinaglia's representations to Judge Shadur that Haenschen was "kind of on his own" and that it would be "inappropriate" to represent both Haenschen and Puig were as fake as a cheap toupee.

Tinaglia also baldly asserts that he only paged Haenschen on July 1 and thus was not lying when he told Judge Shadur that he had not spoken to Haenschen that day. Even if true, this is a fine distinction. But it appears to be false. Haenschen testified that he had a brief conversation with Tinaglia. Telephone records show that, after the page, Haenschen called Tinaglia back twice, including a 3–minute call about one hour before Judge Shadur's hearing began.

■ In addition, Tinaglia says that "any duty to reveal the existence of the state court suit was outweighed by his duty to maintain the confidences of his clients— Puig and Haenschen". For Tinaglia to claim that he owed a duty of confidentiality to client Haenschen in the same appeal in which he claims he was not representing Haenschen in federal court tests the limits of brazenness. In claiming that he had a duty to client Puig to keep the state lawsuit quiet, Tinaglia also peels back the charade of the independence of Haenschen's state action. Tinaglia would have no duty of confidentiality to Puig regarding the state lawsuit if Puig was not involved in the state lawsuit.

■ Regardless of which parties fit into Tinaglia's elastic definition of who he was representing, the duty to protect client confidentiality does not come before the duty to be honest with the court. The comment to Rule 3.3, Rules of Professional Conduct, Northern District of Illinois, states that a lawyer's task of maintaining client confidence "is qualified by the advocate's duty of candor to the tribunal." *See also United States Dep't of Hous. and Urban Dev. v. Cost Control Mktg. & Sales Management of Va., Inc.*, 64 F.3d 920, 925 (4th Cir.1994) ("a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy"); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 458 (4th Cir.1993) ("the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit"). Also, as CHC points out, the way to claim a privilege is by invoking it openly, not by silent concealment.

Tinaglia had a duty to disclose the state lawsuit he had prepared and that was simultaneously being filed. "Lawyers have a duty of candor to the tribunal. Counsel for appellant would be well-advised to observe that violations of this duty can lead to sanctions even more severe than payment of an opponent's fees and costs." *Beam v. IPCO Corp.*, 838 F.2d 242, 249(7th Cir.1988). Counsel have a continuing duty to inform the Court of any development which may conceivably affect the outcome

of the litigation. *Tiverton Bd. of License Comm'rs v. Pastore,* 469 U.S. 238, 240, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985) (dismissing previously granted writ of certiorari as moot). The goal of the state lawsuit was to cut off the federal court at the pass, a development that surely could have affected the outcome of the litigation pending in federal court.

Tinaglia's counsel suggested at oral argument that Tinaglia simply was confused. We do not find confusion a credible explanation for Tinaglia's misrepresentations about Haenschen and his silence about the state action when the purpose of the hearing was to decide whether Haenschen should be added as a party in the federal case and whether to enjoin any state action. Tinaglia's failure to be truthful and candid was sanctionable.

How CHC could have racked up $259,121 in attorneys fees because of Tinaglia's misconduct is as mysterious as how one man can go bald while his brother gloats in a full head of hair. *Brown v. Federation of State Med. Bds.,* 830 F.2d 1429, 1438 (7th Cir.1987), instructs district courts, in cases of substantial sanction awards, to state with some specificity the reasons for the imposition of a sanction and the manner in which the sanction was computed. The district court did not spell out whether the sanctions were being issued under Federal Rule of Civil Procedure 37, under 28 U.S.C. § 1927, or under the inherent power of the court. The district court also was somewhat fuzzy about whether it was sanctioning Tinaglia solely because of his misconduct on July 1 or whether there was other misbehavior, and consequently it is unclear whether the sanction compensates CHC only for legal expenses stemming from the July 1 hearing or covers additional expenses.

■ The size of the sanction strikes us as a bit much, frankly, but Tinaglia's protest that the sanction is excessive is tardy. Tinaglia defied Judge Shadur's order to confer with the other parties about the appropriate amount of attorneys fees and pouted on the sidelines while Puig and Haenschen stipulated that CHC incurred at least $174,121 in attorneys fees. "A lawyer dismayed by an adverse ruling must obey, however much he disagrees with its wisdom. Swift compliance is especially important when the genesis of the adverse ruling is misconduct in the litigation; refusal to make amends compounds the infraction." *Cleveland Hair Clinic,* 106 F.3d at 168. Tinaglia could have refused to stipulate and forced an evidentiary hearing. By boycotting the whole process he waived his objection. In the subsequent phase, when Tinaglia did participate, he reserved the right to appeal whether sanctionable conduct had occurred but stipulated that—if sanctionable conduct occurred—CHC had incurred an additional $85,000 in attorneys fees as a result. Voluntary stipulations bind the parties. *River v. Commercial Life Ins. Co.,* 160 F.3d 1164, 1173 (7th Cir.1998).

■ So, we conclude that the district court did not abuse its discretion in sanctioning Tinaglia for providing false information and failing to disclose relevant information. And we also conclude that Tinaglia waived his objection to the amount of the sanction. We now move to another sanction issue.

■ CHC characterizes Tinaglia's appeal as frivolous and asks for attorneys fees and expenses for this appeal. *See* Fed. R.App. P. 38. In weighing such a request, we consider first whether the appeal is frivolous and, if so, whether sanctions are appropriate. Imposing sanctions is discretionary. *Pokuta v. Trans World Airlines, Inc.,* 191 F.3d 834 (7th Cir.1999). An appeal is frivolous if the result is obvious. *See Tomczyk v.Blue Cross & Blue Shield United of Wis.,* 951 F.2d 771, 779 (7th Cir.1991). Tinaglia's attempts to worm his way out of his overt and covert fibs to the district court were wholly unconvincing and, particularly in light of the deferential standard on appeal, had little chance of success on this appeal. Tinaglia might have had a legitimate beef about the severity of the sanction but, as we said, he

forfeited his chance to complain about that by shunning the first round of fact-finding on the appropriate amount of sanctions and by stipulating to the amount in the second round. Yet, because the sanction was so steep, we cannot find that this appeal was so glabrous that more sanctions—in the form of attorneys fees on this appeal—should be added to the mix.

We are left now with an equally troubling—or perhaps ironic—issue: the performance at oral argument of Tinaglia's attorney, who one might think would have been careful to stay on the straight and narrow in arguing a case about unethical legal tactics. Because Tinaglia's obfuscations on July 1, 1996, justified sanctions, and because Tinaglia waived his objection to the amount of the sanction, this opinion does not address whether Tinaglia engaged in sanctionable conduct outside of the July 1 hearing. The parties did address that issue at oral argument, however, with Tinaglia's counsel saying any sanctionable behavior was limited to July 1 and CHC's counsel arguing that the district court's sanctions were not based exclusively on the July 1 hearing.

Tinaglia's counsel, Jerome H. Torshen, began his argument by displaying on an easel a big blown-up quotation of a footnote from the district court's November 22, 1996, opinion, which read: "Cleveland Hair has not requested a determination as to the applicability of the attorney-client privilege to any communications about which evidence was received at the sanctions hearing, other than those occurring on and after June 27. This Court has therefore made no findings about whether defendants' prior attorneys (Tinaglia's law firm) were participants in any wrongful conduct before that date." Torshen said the excerpt showed that the district court had not found Tinaglia guilty of any sanctionable behavior prior to June 27 and, because shortly after July 1 Tinaglia was replaced by substitute counsel, the behav-

ior sanctioned by Judge Shadur had to have been confined to July 1 and could not have been based on 28 U.S.C. § 1927, which punishes unreasonably and vexatiously multiplying judicial proceedings.

It looks to us like Torshen may have distorted the footnote, which was lifted from the opinion in which Judge Shadur granted CHC's motion for a preliminary injunction on the underlying contract dispute. *Cleveland Hair Clinic*, 968 F.Supp. at 1241 n.14. In the footnote Judge Shadur merely clarified that none of his findings regarding the preliminary injunction were based on evidence that was admitted during the earlier sanctions proceedings and that involved attorney-client communications prior to June 27 that might violate the attorney-client privilege if used for any purpose other than weighing sanctions. Essentially, the footnote says that deciding whether Tinaglia's law firm participated in wrongful conduct before June 27 was unnecessary to deciding CHC's motion for a preliminary injunction. Just because Judge Shadur did not need to reach this issue to rule on the preliminary injunction motion does not mean Judge Shadur never found that Tinaglia engaged in misconduct prior to June 27.[4]

Spirited argument before this court is encouraged, but not deception. "An honest presentation of the case, adherence to the basic technical rules, and a colorable basis in law and fact—as well as a certain amount of common sense—will shield litigants and their attorneys from sanctions." *Tomczyk*, 951 F.2d at 779. Like Tinaglia in the district court, Torshen, in front of this court, may have crossed the line from vigorous representation into unethical advocacy.

Consequently, under Federal Rule of Appellate Procedure 46(c), we give Torshen 14 days to show cause why he should not be sanctioned for attempting to mis-

---

4. Judge Shadur's October 22, 1996, opinion and order imposing sanctions suggests that Tinaglia did participate in misconduct prior to June 27. For example, Judge Shadur held

Tinaglia jointly and severally liable for Puig and Haenschen's misconduct, which included filing a "baseless" TRO motion on June 21.

lead this court by taking the footnote out of context.

The judgment below is AFFIRMED. An order to show cause to attorney Torshen is issued.

## ORDER

Feb. 4, 2000.

We concluded our January 10, 2000, opinion in this case with a request that Jerome H. Torshen, counsel for Michael Tinaglia and his law firm, show cause under Federal Rule of Appellate Procedure 46(c) because we thought he "may have distorted the footnote" that appeared in the district court's opinion granting CHC's motion for a preliminary injunction on the underlying contract dispute in this case. Mr. Torshen has responded to our request, and we have carefully considered his response. Having done so, we conclude that Attorney Torshen has demonstrated that he did not attempt to deliberately mislead the court through the manner in which he displayed and referred to the footnote in question. For that reason, we issue today's opinion as a supplement to the one we issued on January 10, and we specifically exonerate Mr. Torshen from any accusation of unprofessional conduct. Any implication to the contrary in our earlier opinion is withdrawn.

So ORDERED.