In the

# United States Court of Appeals
## For the Seventh Circuit

————————

Nos. 07-1660 & 07-2116

JUDSON ATKINSON CANDIES, INC.,

*Plaintiff-Appellant*,

*v.*

LATINI-HOHBERGER DHIMANTEC ET AL.,

*Defendants-Appellees.*

————————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 05 C 2203—**Ruben Castillo**, *Judge.*

————————

ARGUED NOVEMBER 9, 2007—DECIDED JUNE 3, 2008

————————

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
RIPPLE, *Circuit Judges*.

CUDAHY, *Circuit Judge*.  This case reflects the efforts of
Judson Atkinson Candies, Inc. (Judson Atkinson) to
collect a judgment it obtained against LMC International,
an Illinois company that is no longer in business. Unable
to collect the money owed it, Judson Atkinson sued
L Liquidation Company f/k/a LMC International (LMC),
LMC's holding company and several of LMC's officers
in an attempt to hold them liable for LMC's judgment
debt. The district court granted summary judgment for

the defendants. Judson Atkinson appeals. We vacate and remand for further explanation of the district court's entry of judgment for LMC and affirm the court's grant of summary judgment for the remaining defendants.

## I. Background

LMC was an Illinois company that sold confectionary cooking and processing machines. LMC's outstanding shares were wholly owned throughout its existence by CIC, a Delaware holding company. The outstanding shares of CIC's stock were owned by Barry Carroll and a trust of which Carroll is the sole beneficiary. Carroll is also the President and Chairman of CIC and was the CEO and Chairman of LMC. Defendant James Elsen was the Vice President and Chief Operations Officer of CIC and the Secretary-Treasurer of LMC from 1991 to 2005. Defendant Roger Hohberger began working for LMC in 1996 after the company acquired the assets of his candy machinery manufacturing company. From 2001 to 2003 he was the Vice President of Sales at LMC.

In the fall of 2002, CIC began trying to sell LMC's assets. Elsen and LMC's President at that time, Peter Loveland, attended a candy machinery trade show in Germany. There they met Arminder Dhiman, the owner of Dhiman Industries. In October 2003, Dhiman paid $475,000 to acquire two of LMC's product groups, the Hohberger Products Group and the Latini Products Group. After the sale, Hohberger went to work for Dhiman Industries, which subsequently was named Latini-Hohberger Dhimantec, Inc. (Dhimantec). Hohberger also purchased 10 percent of Dhimantec's stock for $80,000, making him one of that company's two shareholders.

Some of LMC's remaining equipment was sold to Deister Products, a CIC subsidiary, for unknown consideration. Another CIC subsidiary, Carroll Manufacturing, also purchased some of LMC's equipment. In 2003, via an Assignment for the Benefit of Creditors, LMC assigned its remaining assets to James Lindeman for the purposes of liquidation and payment to its creditors. LMC is no longer in business.

In the context of these transactions, LMC was engaged in litigation with Judson Atkinson in federal court. Over the years LMC had sold several candy-making machines to Judson Atkinson. In 2002, Judson Atkinson filed suit against LMC in Texas claiming that one of the machines it had purchased from LMC was defective. LMC did not appear for the trial and in 2004, Judson Atkinson obtained a default judgment against LMC for breach of contract in the amount of almost $3,000,000. LMC never disclosed to Judson Atkinson prior to trial that it had ceased operations and conveyed its assets to other entities. Judson Atkinson subsequently filed the present lawsuit in the district court for the Western District of Texas to collect the underlying judgment. That court transferred the case to the Northern District of Illinois on *forum non conveniens* grounds. *See* 28 U.S.C. § 1404(a). Judson Atkinson alleged that LMC had fraudulently transferred its assets to the defendants in order to avoid its judgment debt in violation of Texas's Uniform Fraudulent Transfer Act (UFTA). Judson Atkinson also asserted veil-piercing and breach of fiduciary duty theories of liability under which, it contended, CIC and the individual defendants should be found liable for LMC's judgment debt.

After extensive discovery, Judson Atkinson, CIC, Elsen, Carroll and Hohberger filed cross-motions for sum-

mary judgment. Carroll also moved to strike exhibits filed with Judson Atkinson's motion for summary judgment, including Exhibits 10 and 11. These exhibits were lists that Judson Atkinson had prepared that supposedly summarized transfers from CIC's bank account to various individuals and entities. Judson Atkinson had labeled the transfers "fraudulent" on the theory that the funds transferred from CIC were actually LMC's funds that were distributed to the transferees to ensure that Judson Atkinson could not recover its judgment. Carroll argued that the exhibits lacked a proper foundation and had not been authenticated, and therefore were improper summaries, inadmissible under Federal Rule of Evidence 1006. (R. 235 ¶¶ 22-30.) In addition, CIC and Elsen filed a motion for sanctions alleging that Judson Atkinson had violated Federal Rule of Civil Procedure 45 by failing to serve notice on the defendants of subpoenas issued to two financial institutions—MB Financial and Northern Trust Company—and failing to timely disclose the documents it received in response to the subpoenas. (R. 252.) CIC also filed a motion to compel the return of a memorandum prepared by its attorneys, Seyfarth Shaw L.L.P. (Seyfarth Shaw memorandum). It alleged that the memo, which was filed as an exhibit to one of Judson Atkinson's filings, had been produced inadvertently to Judson Atkinson and was covered by the attorney-client privilege.

The district court granted Carroll's motion to strike Exhibits 10 and 11 and the defendants' motion for sanctions. The court also granted CIC's motion to compel the return of the Seyfarth Shaw memorandum, concluding that CIC had not waived the attorney-client privilege. In addition, the court concluded that Judson Atkinson had not presented evidence supporting its veil-piercing

argument or its fraudulent transfer claims. The district court granted the defendants' motions for summary judgment and ordered that judgment be entered in favor of all defendants, including Dhimantec and LMC, which had not filed motions for summary judgment.

Judson Atkinson appeals the entry of summary judgment in favor of Dhimantec, LMC, CIC, Hohberger, Elsen and Carroll, as well as the district court's grant of the defendants' motion to strike, motion for sanctions and motion to compel the return of the Seyfarth Shaw memorandum.

## II. Discussion

Initially this lawsuit was filed in the United States District Court for the Western District of Texas. That court determined that it was not the most appropriate venue for resolution of the lawsuit and that venue was most appropriate in Illinois. Pursuant to 28 U.S.C. § 1404(a), it transferred the lawsuit to the Northern District of Illinois, Eastern Division. The district court to which the case was transferred should have applied Texas choice-of-law rules. *See Ferens v. John Deere Co.*, 494 U.S. 516, 523, 110 S. Ct. 1274, 108 L. Ed. 2d 443 (1990) ("A transfer under § 1404(a) . . . does not change the law applicable to a diversity case."); *Nelson v. Sandoz Pharm. Corp.*, 288 F.3d 954, 963 n.7 (7th Cir. 2002); *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 729 (7th Cir. 1999). Ultimately, however, the district court's application of Illinois choice-of-law rules yielded the same results as the application of Texas choice-of-law rules would have produced. Thus, we analyze Judson Atkinson's claims under the same substantive law as the dis-

trict court applied. We address each of Judson Atkinson's theories of liability in turn.

## A.  Veil-piercing claims

Texas has the same choice-of-law rule for veil-piercing claims as Illinois, namely that the law of the state of incorporation governs such claims. *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995) (citing Tex. Bus. Corp. Act. Ann. art. 8.02 (West Supp. 1994)). LMC was incorporated in Illinois and CIC in Delaware. Thus, the district court correctly applied the laws of Illinois and Delaware to Judson Atkinson's veil-piercing claims.

Judson Atkinson claims that LMC's corporate veil should be pierced to hold CIC, Carroll, Elsen and Hohberger liable for the 2004 default judgment. Under Illinois law, a corporation is presumed to be "separate and distinct from its officers, shareholders, and directors, and those parties will not be held personally liable for the corporation's debts and obligations." *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007). A corporation's veil of limited liability will be pierced only when there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist[,]" and when "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985) (quoting *Macaluso v. Jenkins*, 420 N.E.2d 251, 255 (Ill. App. Ct. 1981) (alteration in original)). Piercing the corporate veil is not favored and in general, courts are reluctant to do so. *See In re KZK Livestock, Inc.*, 221 B.R. 471, 478 (Bankr. C.D. Ill. 1998) (citing *C*

*M Corp. v. Oberer Dev. Co.*, 631 F.2d 536 (7th Cir. 1980); *In re Kevin W. Emerick Farms, Inc.*, 201 B.R. 790 (Bankr. C.D. Ill. 1996)). Accordingly, a party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a "dummy or sham" for another person or entity. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996).

Illinois courts consider the following factors when determining whether there is sufficient "unity of interest" to justify disregarding the corporate form:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005). Judson Atkinson argues that several of these factors are present: LMC was undercapitalized, LMC failed to observe corporate formalities and LMC's funds were commingled with those of CIC and Carroll.

Judson Atkinson argues that because LMC was losing money, it was undercapitalized. But a court will find a corporation to be undercapitalized only when it "has 'so little money that it could not and did not actually operate its nominal business as its own.' " *Firstar Bank, N.A.*

*v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1041 (N.D. Ill. 2003) (quoting *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999)). The fact that a corporation is losing money does not show that it is undercapitalized. *See Firstar Bank*, 249 F. Supp. 2d at 1042 ("[T]he evidence that the Dealership was losing money has no probative value in showing that the corporation was undercapitalized."). Judson Atkinson provided no evidence that LMC "maintained a lower capitalization than the law required." *Browning-Ferris Indus. of Ill.*, 195 F.3d at 961.

Judson Atkinson also alleges that LMC failed to observe corporate formalities. It is undisputed that LMC was incorporated in Illinois, that it filed annual reports with the Illinois Secretary of State and that it held annual meetings. (R. 232, Pl's Resp. To CIC's Facts ¶ 16.) In addition, LMC issued stock certificates to CIC, conducted board meetings and entered into contracts in its own name. The only evidence Judson Atkinson points to as proof of LMC's failure to observe corporate formalities is the company's failure to file tax returns since 1999. This is not enough to justify treating LMC as a mere shell. *See Jacobson*, 664 N.E.2d at 331 ("[M]erely missing one annual meeting is not a sufficient showing of failure to observe corporate formalities."); *People v. V & M Indus., Inc.*, 700 N.E.2d 746, 751-52 (Ill. App. Ct. 1998) (failure to hold regular meetings, take minutes, maintain corporate records showed failure to observe corporate formalities); *Ted Harrison Oil Co., Inc. v. Dokka*, 617 N.E.2d 898, 902 (Ill. App. Ct. 1993) (finding a "complete lack of corporate formalities" where "[n]o records were kept and the company did not hold formal shareholder or director meetings").

Finally, Judson Atkinson alleges that LMC's funds were commingled with those of CIC and Carroll, stating that an outside consultant concluded that LMC did not have a separate bank account, that transfers were made between LMC and CIC and that proceeds of loans to LMC were deposited into accounts owned by CIC. Ultimately, Judson Atkinson's intermingling argument is based on CIC's use of a cash management system. But the use of a cash management system alone is not evidence that funds are being improperly commingled. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995) ("Courts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system."); *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 34 (D. Mass. 1987) ("A centralized cash management system . . . where the accounting records always reflect the indebtedness of one entity to another, is not the equivalent of intermingling funds."); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 846 (D. Del. 1978) ("Arrangements by a parent and subsidiary for economy of expense and convenience of administration may be made without establishing the relationship of principal and agent."). Judson Atkinson has not cited any evidence to counter CIC's assertions that it maintained a strict accounting of each subsidiary's balance. In addition, Judson Atkinson does not point to any evidence supporting its blanket assertions that LMC's funds were used to pay CIC's expenses. Nor does Judson Atkinson offer proof to support its allegation that advances Carroll received from CIC were made from funds belonging to LMC. Thus, the district court correctly concluded that Judson Atkinson failed to present sufficient proof that improper commingling occurred.

Where Judson Atkinson has cited specific, verifiable facts to support its veil-piercing argument, those facts do not come close to making "a substantial showing that the corporation is really a dummy or sham for a dominating personality." *Rosier v. Cascade Mountain, Inc.*, 855 N.E.2d 243, 251 (Ill. App. Ct. 2006) (internal quotation marks and citation omitted). Judson Atkinson argues that Carroll's control of both CIC and LMC weighs in favor of finding a unity of interest. It points to CIC's ownership of LMC's stock and Carroll's ownership of CIC's stock. But "[t]he separate corporate entities of two corporations may not be disregarded merely because one owns the stock of another . . . ." *Hornsby v. Hornsby's Stores, Inc.*, 734 F. Supp. 302, 308 (N.D. Ill. 1990) (quoting *Sumner Realty Co. v. Willcott*, 499 N.E.2d 554, 557 (Ill. App. Ct. 1986)). In Illinois, the principle that "[a] corporation is a legal entity separate and distinct from its shareholders, directors, and officers. . . . applies even where one corporation wholly owns another and the two have mutual dealings." *Joiner v. Ryder Sys. Inc.*, 966 F. Supp. 1478, 1483 (C.D. Ill. 1996) (internal quotation marks and citation omitted) (alteration in original). *See also Plastic Film Corp. of Am., Inc. v. Unipac, Inc.*, 128 F. Supp. 2d 1143, 1147 (N.D. Ill. 2001) ("[T]he fact that a corporation has only one single shareholder is not proof that the corporation is the 'alter ego' of that shareholder."); *Melko v. Dionisio*, 580 N.E.2d 586, 595 (Ill. App. Ct. 1991) (noting that "the mere allegation that [defendant] was a dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate existence"). Judson Atkinson also points out that Carroll was an officer of both CIC and LMC. While having common officers and directors is generally a prerequisite to piercing the corporate veil, this factor is insufficient to

justify disregarding the corporate form because it is a "common business practice" that "exist[s] in most parent and subsidiary relationships." *C M Corp.*, 631 F.2d at 539 (citation omitted). The fact that Carroll owned the outstanding shares of CIC, LMC's parent company, "only shows that [he] may have had the opportunity to create a unity of interest," not that he actually did so. *Firstar Bank*, 249 F. Supp. 2d at 1040 n.3. Judson Atkinson has failed to show that LMC is an alter ego of CIC or Carroll and thus, the district court properly entered summary judgment for those defendants.[1]

Judson Atkinson's veil-piercing claims against Elsen and Hohberger appear to be baseless. The evidence supporting Judson Atkinson's veil-piercing claim against Hohberger seems to consist of nothing more than the

---

[1] Even if Judson Atkinson had shown that LMC was a sham corporation, it has failed to provide evidence that would satisfy the second element of a successful veil-piercing claim under Illinois law, i.e., showing that failure to pierce the corporate veil "would sanction a fraud or promote injustice." *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 520 (7th Cir. 1991) (quoting *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)). The injustice must be more than the prospect of an unsatisfied judgment. *Id.* at 522. A plaintiff must show that "a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *Id*. at 524. Judson Atkinson has not pointed to evidence tending to show that any such injustice would result from the district court's refusal to pierce LMC's corporate veil.

fact that Hohberger was employed by LMC and was aware of the company's financial difficulties. The evidence Judson Atkinson offers against Elsen is that he was an officer of LMC and CIC and had knowledge of the corporations' respective finances. Under Illinois law, it is possible for a non-shareholder to be found personally liable under a veil-piercing theory. *See Fontana*, 840 N.E.2d at 776. But Judson Atkinson has failed to provide any evidence that either Elsen or Hohberger "exercise[d] ownership control" over LMC "to such a degree that the separate personalities of [LMC] and [the defendants] did not exist, and that [LMC] was a business conduit of [Elsen and Hohberger]." *Macaluso v. Jenkins*, 420 N.E.2d at 256.

Finally, Judson Atkinson argues that the district court erred in refusing to pierce CIC's corporate veil to hold Carroll and Elsen liable. Since Judson Atkinson has a judgment against LMC alone, whether or not CIC's veil could ever be pierced to hold Carroll or Elsen liable for an obligation owed by CIC is irrelevant. We have determined that Judson Atkinson did not show that LMC was an alter ego of CIC. Since LMC's veil cannot be pierced to hold CIC liable for the default judgment, liability for the default judgment cannot be imposed on Carroll or Elsen by piercing CIC's corporate veil.

## B. Fraudulent transfer claims

Next we address Judson Atkinson's argument that the district court erred when it entered judgment in favor of CIC, Carroll, Dhimantec and Hohberger with respect to its fraudulent transfer claims. Judson Atkinson asserts that Texas law applies to its fraudulent transfer claims and

that the district court erred in applying Illinois law. Texas courts apply the "most significant relationship" test to decide choice-of-law issues. *See Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000); *Gutierrez v. Collins*, 583 S.W.2d 312, 318-19 (Tex. 1979). This is the same choice-of-law rule used in Illinois. *See Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996). Therefore the district court's choice of law would have been the same if it had applied Texas choice-of-law principles. Illinois has the most significant relationship to the case and thus, Illinois law should apply to Judson Atkinson's fraudulent transfer claims.

1.  Exhibits 10 and 11

Because Judson Atkinson relies on Exhibits 10 and 11, which the district court struck, to support its fraudulent transfer claims, we address whether the court erred in striking those exhibits before deciding whether there was sufficient evidence for Judson Atkinson to have moved forward on its fraudulent transfer claims. Exhibits 10 and 11 are charts that Judson Atkinson prepared that summarize allegedly fraudulent transfers from LMC and CIC to third parties. We review the district court's decision to strike Judson Atkinson's exhibits for abuse of discretion. *Winfrey v. City of Chicago*, 259 F.3d 610, 618-19 (7th Cir. 2001). "Under the Local Rules of the Northern District of Illinois, a party filing a motion for summary judgment under Fed. R. Civ. P. 56 must serve and file 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.' " *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d

1104, 1107-08 (7th Cir. 2004) (quoting N.D. Ill. Local R. 56.1(a)(3)). The evidence supporting a factual assertion must represent admissible evidence. *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). Judson Atkinson's argument that the exhibits were admissible summaries under Federal Rule of Evidence 1006 is unavailing. "The admission of a summary under Fed. R. Evid. 1006 requires 'a proper foundation as to the admissibility of the material that is summarized and . . . [a showing] that the summary is accurate . . . .'" *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990) (quoting *United States v. Driver*, 798 F.2d 248, 253 (7th Cir. 1986)) (alteration in original). Judson Atkinson did not address these requirements. It did not establish the admissibility of the records on which the summaries were allegedly based or authenticate the summaries in any way. *See Needham v. White Laboratories, Inc.*, 639 F.2d 394, 403 (7th Cir. 1981) ("Before a summary is admitted, the proponent must lay a proper foundation as to the admissibility of the material that is summarized and show that the summary is accurate."). Because Judson Atkinson failed to properly authenticate the summaries in Exhibits 10 and 11, the district court acted within its discretion by striking them.[2]

---

[2] The district court also concluded that the exhibits represented improper legal argument. Local Rule 56.1 requires that statements of facts concerning summary judgment motions identify the evidence supporting a party's factual assertions. *Malec*, 191 F.R.D. at 585. It is inappropriate to make legal arguments in a Rule 56.1 statement of facts. *Id*. *See also Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1072 (N.D. Ill. 2007). We have held that a district court has broad discretion to require strict compliance with Local Rule 56.1. *See Koszola*, 385 F.3d at

(continued...)

2. <u>Fraudulent transfer claims</u>

Under Illinois law, a fraudulent transfer claim requires a debtor/creditor relationship. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 629 (7th Cir. 2002) (citing *A.P. Properties, Inc. v. Goshinsky*, 714 N.E.2d 519, 522 (Ill. 1999)). LMC is the debtor in this case. Judson Atkinson argues that Carroll, acting through LMC and CIC (allegedly his alter egos), made fraudulent transfers in violation of the UFTA. Because, as we have already determined, Judson Atkinson cannot pierce LMC's corporate veil, it cannot maintain its fraudulent transfer claim against Carroll based on the theory that Carroll is LMC's alter ego and therefore is a debtor under the UFTA.

Judson Atkinson argues on appeal that its fraudulent transfer claims do not depend on accepting an alter ego theory of liability and it offers a theory of liability based on the defendants' status as first transferees and subsequent transferees: LMC made fraudulent transfers to CIC and Dhimantec, who are first transferees. They, in turn, made transfers to Carroll and Hohberger, who are subsequent transferees. To support its fraudulent transfer claims, Judson Atkinson cites CIC's use of a sweep account system, which we have already stated is not evidence of commingling or fraud. Judson Atkinson makes blanket

---

[2] (...continued)

1109. The district court was correct that by labeling the charts "fraudulent transfers," Judson Atkinson made an improper legal argument since whether or not any transfers were fraudulent is a legal conclusion. In striking the exhibits, the court acted within its discretion in interpreting its own local rules. *See Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995).

assertions that LMC's funds were used to pay bills for other entities without citing any evidence in the record supporting these charges. It asserts that CIC made transfers to insiders without providing any proof showing that the funds allegedly transferred by CIC belonged to LMC. Judson Atkinson further claims that the alleged transfers from LMC to CIC and from CIC to various individuals were made without receiving reasonably equivalent value but again, cites no evidence to support this claim. The only evidence Judson Atkinson offers to support its fraudulent transfer claims against Dhimantec and Hohberger is the fact that CIC sold some of LMC's assets to Dhimantec for $475,000. But Judson Atkinson fails to provide any evidence suggesting that the assets were more valuable than the price that was paid, making only the curious argument that because Hohberger purchased 10 percent of Dhimantec's stock for $80,000 after Dhimantec bought assets from LMC, the assets LMC sold Dhimantec must have been worth at least $800,000. If Dhimantec had not had any assets at all before the sale, this argument might hold water. But Judson Atkinson has not offered any evidence of Dhimantec's value prior to the transaction and there is no indication that it was not an operating company with assets of its own prior to buying assets from LMC. In light of Judson Atkinson's failure to show that any particular transfers were in fact fraudulent, the district court properly granted the defendants' motions for summary judgment with respect to these claims.

## C. Breach of fiduciary duty

Under Texas choice-of-law rules, the state of incorporation governs claims for breaches of fiduciary duties. *See*

*King v. Douglass*, 973 F. Supp. 707, 723 (S.D. Tex. 1996). Illinois law thus governs Judson Atkinson's claim that LMC's officers breached their fiduciary duties. Judson Atkinson contends that Carroll, Elsen and Hohberger, as officers of LMC, owed fiduciary duties to Judson Atkinson because Judson Atkinson is a creditor of LMC and that they breached those duties. The defendants assert that Judson Atkinson lacks standing to bring such a claim. In general, the officers and directors of a corporation do not owe fiduciary duties to creditors of the corporation. *See Macaluso*, 420 N.E.2d at 257. But in special circumstances, such as insolvency, directors do owe a duty to creditors. *See Technic Eng'g, Ltd. v. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999). Some courts have found that the special circumstance fiduciary duty "runs to all creditors as a group, and not to any individual creditor," and therefore that "only the corporation or its representative in bankruptcy can maintain a claim for an alleged breach of this duty." *Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 97 (Ill. App. Ct. 2002) (applying Delaware law). *See also North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) ("The creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against its directors."). Although the Illinois Supreme Court has not addressed whether a corporation's creditor may bring a direct claim for breach of special circumstance fiduciary duty, several courts have found that under Illinois law, creditors can sue for such a breach. *See Technic Eng'g, Ltd.*, 53 F. Supp. 2d at 1010-12; *O'Connell v. Pharmaco, Inc.*, 493 N.E.2d 1175, 1182 (Ill. App. Ct. 1986); *Circle Sec. Agency, Inc. v. Ross*, 425

N.E.2d 1283, 1286 (Ill. App. Ct. 1981). Even if we were to assume that Judson Atkinson has standing to sue for a breach of special circumstance fiduciary duty, however, Judson Atkinson's breach of fiduciary duty argument is mainly a rehashing of its veil-piercing argument. Judson Atkinson does not cite the elements of a breach of fiduciary duty claim or show how any evidence in the record tends to support such a claim. As a result, it has waived this argument. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim.") (citation omitted).

### D. The district court's grant of summary judgment *sua sponte* in favor of Dhimantec and LMC

Judson Atkinson contends that the district court erred in granting summary judgment in favor of LMC and Dhimantec, with respect to its alter ego and fraudulent conveyance claims, because neither of them filed a motion for summary judgment. District courts have the authority to enter summary judgment *sua sponte* "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In addition, we have held that if a district court grants one defendant's motion for summary judgment, it may *sua sponte* enter summary judgment in favor of non-moving defendants if granting the motion would bar the claim against those non-moving defendants. *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986). *See also Acequia, Inc. v. Prudential Ins. Co. of Am.*, 226 F.3d 798, 807 (7th Cir. 2000) (*sua sponte* grant of summary judg-

ment appropriate "where one defendant succeeds in winning summary judgment on a ground common to several defendants, if the plaintiff had an adequate opportunity to argue in opposition").

In order to show that Dhimantec is an alter ego of LMC, Judson Atkinson would have had to show that LMC is a sham corporation by considering such factors as whether LMC observed corporate formalities, was adequately capitalized or maintained corporate records. In short, it would have to show the same things it would have to establish in order to pursue its alter ego/veil-piercing claims against CIC and Carroll. Having found that Judson Atkinson failed to present evidence sufficient to justify disregarding LMC's corporate form, the district court properly entered summary judgment in favor of all defendants with respect to Judson Atkinson's alter ego claims. Judson Atkinson was also on notice that it had to come forward with evidence establishing LMC's fraudulent conveyance of its assets to Dhimantec because the legitimacy of that sale was asserted in the summary judgment motions of Carroll, CIC and Hohberger. In its responses to those motions, Judson Atkinson failed to provide any evidence showing that the sale of LMC assets to Dhimantec was not for reasonably equivalent value. Thus, we affirm the district court's *sua sponte* grant of summary judgment in favor of Dhimantec.

Judson Atkinson also argues that the district court erred in entering summary judgment *sua sponte* in favor of LMC. LMC did not appear and the district court entered a default against it. The district court subsequently entered summary judgment for LMC when it granted the other defendants' motions for summary

judgment. Although the district court entered a
default against LMC, it did not enter a default judg-
ment. *See United States v. Hanson*, 795 F.2d 35, 37 (7th Cir.
1986) ("[A]n order of default is not a final judgment,
though a default judgment is."); *United States v. Borchardt*,
470 F.2d 257, 260 (7th Cir. 1972) ("[A]lthough a default
may serve as the basis for a default judgment . . . , the
entry does not of itself determine rights.") (citation omit-
ted). Federal Rule of Civil Procedure 55(c) allows a
court to set aside an entry of default for good cause and
to set aside a default judgment under Rule 60(b), which
states that a court may relieve a party from a final judg-
ment "on motion." While relief from a default judgment
is usually granted on a motion filed by the defaulting
party, a majority of circuits to have considered the power
of a district court to vacate a judgment under Rule 60(b)
have concluded that district courts have the discretion to
grant such relief *sua sponte. See Pierson v. Dormire*, 484
F.3d 486, 491-92 (8th Cir. 2007), *vacated in part on rehearing
on other grounds by* 2008 WL 1946857 (8th Cir. 2008);
*Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354,
1359 n.1 (Fed. Cir. 2006); *Fort Knox Music Inc. v. Baptiste*,
257 F.3d 108, 111 (2d Cir. 2001) (noting that while relief
from judgment is usually sought by motion of a party,
"nothing forbids the court to grant such relief *sua sponte*");
*Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d
347, 351-52 (9th Cir. 1999); *McDowell v. Celebrezze*, 310 F.2d
43, 44 (5th Cir. 1962); *United States v. Jacobs*, 298 F.2d
469, 472 (4th Cir. 1961). *But see United States v. Pauley*, 321
F.3d 578, 581 (6th Cir. 2003) (reasoning that "because Rule
60(b) explicitly requires relief under the rule to occur 'on
motion,' courts may not grant such relief except upon 'a
motion from the affected party'") (citation omitted); *Dow
v. Baird*, 389 F.2d 882, 884-85 (10th Cir. 1968). Unlike Rule

60(b), Rule 55(c) does not refer to a motion but simply states that a "court may set aside an entry of default for good cause." In addition, we believe that a district court that has entered a default against a party retains "the power to act in the interest of justice in an unusual case in which its attention has been directed to the necessity of relief by means other than a motion," *Pierson*, 484 F.3d at 491 (quoting *Kingvision Pay-Per-View*, 168 F.3d at 351), particularly since Rule 55(c) does not require a motion. Without deciding whether a district court could set aside a default judgment *sua sponte*, we believe that the district court had the authority to set aside *sua sponte* an entry of default against LMC for good cause. In the present case, it seems that the district court did just that when it granted summary judgment for LMC. However, the district court did not make clear that it was setting aside the entry of default for good cause or explain its decision to grant summary judgment for LMC. Therefore, we vacate and remand to the district court for an explanation of its decision.

### E.  The district court's imposition of sanctions

We review a district court's imposition of sanctions for abuse of discretion. *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1066 (7th Cir. 2000). We will only reverse a district court's imposition of sanctions if one or more of the following is true: "(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 495 (7th Cir. 1996) (citing *Haworth, Inc. v. Herman Miller, Inc.*,

998 F.2d 975, 977 (Fed. Cir. 1993)). Judson Atkinson contends that the district court's findings that Judson Atkinson acted in bad faith and that the defendants were prejudiced were clearly erroneous. We disagree.

A court, under its inherent powers, may sanction conduct that it finds to be an abuse of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). In order to impose sanctions pursuant to its inherent power, a court must find that the party " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .' " *Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 928 (7th Cir. 2004) (quoting *Chambers*, 501 U.S. at 45, 111 S. Ct. 2123)). Rule 45 of the Federal Rules of Civil Procedure governs the use of subpoenas. A party must serve each party with prior notice if the subpoena commands the production of documents. Fed. R. Civ. P. 45(b). Prior notice is required in order "to afford other parties an opportunity to object to the production or inspection, or to serve a demand for additional documents or things." Fed. R. Civ. P. 45 committee note, 1991 amendments. The requirements of Rule 45 are clear. Equally clear is the fact that Judson Atkinson violated these requirements.

We have stated that a district court deciding whether to impose sanctions for discovery violations should consider:

> (1) the prejudice or surprise to the party against whom the evidence is being offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).
Although *David* dealt with the imposition of sanctions
for a violation of Rule 26 those factors are equally ap-
plicable to considering the imposition of sanctions for a
violation of Rule 45. The facts strongly suggest that Judson
Atkinson was less than forthright in its use of third-party
subpoenas. First, defense counsel was not provided
with copies of the subpoenas. Then, although Judson
Atkinson began receiving documents in response to the
subpoenas in October, it did not provide copies to the
defendants until November 15, 2006, ten days after the
last installment was received. *See Murphy v. Bd. of Educ.
of Rochester City Sch. Dist.*, 196 F.R.D. 220, 226 (W.D.N.Y.
2000) (where attorney issued third-party subpoenas
without notifying opposing party, failure to share infor-
mation obtained pursuant to subpoena weighed in favor
of imposing sanctions). When defense counsel finally
received the documents and contacted counsel for
Judson Atkinson to protest the fact that Judson Atkinson
failed to provide the defendants with copies of the sub-
poenas, Judson Atkinson misrepresented the time that
it had received responses to the subpoenas, stating that
no documents were received from either bank until after
the close of discovery on November 3rd. This was
simply untrue. Judson Atkinson received some docu-
ments in October. Judson Atkinson's blatant misrepresenta-
tion supports the district court's finding that it was not
acting in good faith.

In addition, Judson Atkinson's violation of Rule 45
deprived the defendants of the opportunity to object to
the subpoenas. Judson Atkinson contends that any preju-
dice to the defendants was negated by its offer to stip-
ulate not to use some of the subpoenaed documents. But

a party may not ignore Rule 45's requirements and then, when caught, dictate the terms under which the subpoenaed materials will be used. Rather, it is within the court's inherent powers to assess the appropriate sanctions for violations of discovery rules. *Chambers*, 501 U.S. at 43-44, 111 S. Ct. 2123. Judson Atkinson's argument that the subpoenaed documents had been produced in the underlying litigation does not cure the prejudice to the defendants since they were not parties to the breach of contract lawsuit between Judson Atkinson and LMC. The district court did not clearly err in finding evidence of bad faith and prejudice to the defendants and hence, we affirm its imposition of sanctions.[3]

## F. Seyfarth Shaw memorandum

Judson Atkinson's final challenge is to the district court's determination that the Seyfarth Shaw memorandum is covered by the attorney-client privilege. We review a district court's findings of fact regarding claims of attorney-client privilege for clear error. *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 787 (7th Cir. 2005). "We shall reverse only if, on review of the entire evidence, we are 'left with the definite and firm conviction that a mistake has

---

[3] Judson Atkinson asserts that the amount of the sanctions was unreasonable, but does not go beyond this bare assertion. Given that the amount of the sanctions was close to (actually, slightly less than) the amount sought by the defendants, which they supported with billing records, we will not disturb the district court's determination. *See Cleveland Hair Clinic*, 200 F.3d at 1066 ("This court rarely will disturb a district judge's reasoned decision to choose a particular level of sanctions.").

been committed' in the application of the law to the facts." *Jenkins v. Bartlett*, 487 F.3d 482, 491 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 654 (2007) (quoting *Malachinski v. Comm'r*, 268 F.3d 497, 505 (7th Cir. 2001)).

When reviewing claims of privilege, courts in the Northern District of Illinois:

> undertake[ ] a three-part inquiry. As a threshold matter, the court must determine whether the disputed document is indeed [privileged]. If the document is not privileged, the inquiry ends. If the document is privileged, the court must then determine if the disclosure was inadvertent. Lastly, even if the document is found to be [privileged] and inadvertently produced, the court must, nonetheless, determine whether privilege was waived.

*Sanner v. Bd. of Trade*, 181 F.R.D. 374, 376 (N.D. Ill. 1998) (quoting *Harmony Gold U.S.A., Inc. v. FASA Corp.*, 169 F.R.D. 113 (N.D. Ill. 1996)).

"Communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence." *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990). The Seyfarth Shaw memorandum is between two of CIC's attorneys, is printed on Seyfarth Shaw letterhead and is labeled "ATTORNEY CLIENT PRIVILEGED" on every page. Judson Atkinson contends that the memorandum is not covered by the attorney-client privilege because it is subject to the crime-fraud exception, under which "the 'privilege is [ ] forfeited if the attorney is assisting his client to commit a crime or a fraud.'" *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007) (quoting *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763,

769 (7th Cir. 2006)). There is simply no merit to Judson Atkinson's assertion that the memorandum contains advice as to the perpetration of a fraud. Judson Atkinson has failed to show that the memorandum describes anything other than a perfectly legal strategy of filing for bankruptcy to minimize losses. Therefore we conclude that the district court did not err in finding that the memorandum is privileged.

The next step in our analysis is to determine whether the disclosure of the memorandum was inadvertent. "Courts have not established a bright-line rule for determining whether a document was inadvertently produced; instead, courts look at the circumstances surrounding the disclosure." *Harmony Gold*, 169 F.R.D. at 116. "Where discovery is extensive, mistakes are inevitable and claims of inadvertence are properly honored so long as appropriate precautions are taken." *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. 407, 417 (N.D. Ill. 2006). *See also Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 132 F.R.D. 204, 207 (N.D. Ind. 1990) (finding the fact that 14,000 documents had been produced supported finding that disclosure was inadvertent). Carroll's attorney produced over 25,000 pages to Judson Atkinson in connection with this litigation. *See Harmony Gold*, 169 F.R.D. at 116 (where 25,000 pages had been produced, disclosures were found to be inadvertent). In determining that the production was inadvertent, the district court had before it a description of the document review process in the form of an affidavit from the attorney who supervised the document production. There is nothing clearly inadequate about the process described. The fact that one memorandum slipped through does not indicate that the precautionary measures taken by

Carroll's counsel were so deficient that the court clearly erred in finding the document's production was inadvertent.

Finally, we conclude that the district court did not err in determining that the privilege was not waived. The district court followed the "balancing approach" to waiver described in *Harmony Gold*. Under the balancing approach, a court considers: "(1) the reasonableness of the precautions taken to prevent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Harmony Gold*, 169 F.R.D. at 116-17 (citing *Golden Valley Microwave Foods, Inc.*, 132 F.R.D. at 208). As we have already noted, the court did not err in finding the precautions taken by Carroll's counsel to be adequate. *See, e.g.*, *Golden Valley Microwave Foods, Inc.*, 132 F.R.D. at 209 (party failed to show it took adequate measures to protect the privilege where "court [was] left to speculate what specific precautions were taken by counsel to prevent this disclosure"). Nor did it err in finding the scope of discovery in this case to weigh against finding waiver, given that 30-40 boxes of documents were produced on the date the memorandum was produced. Nor does the fairness prong weigh in Judson Atkinson's favor, since the memorandum does not appear to contain any evidence of a crime or fraud.

Judson Atkinson asserts that CIC did not act quickly enough to rectify the error, and thus it waived the privilege. Judson Atkinson filed a copy of the memorandum on November 17, 2006 as an exhibit to its response to Elsen's statement of facts. CIC's counsel sent an email to Judson Atkinson's counsel on November 20th asking for an explanation as to how Judson Atkinson came into possession of the document. CIC's lawyers contacted

Judson Atkinson again in December to ascertain the source of the memorandum, asserting that the memorandum is covered by the attorney-client privilege. It appears counsel for CIC took steps to rectify the error immediately upon learning of the disclosure. *See Harmony Gold*, 169 F.R.D. at 117 (finding that two weeks between learning of disclosure of document and sending letter requesting its return was a "lax" attempt to rectify the error). Since the memorandum was filed with the court, the extent of disclosure may weigh in Judson Atkinson's favor. *See, e.g., id.* at 117-18; *Parkway Gallery Furniture, Inc. v. Kittinger/ Pennsylvania House Group, Inc.*, 116 F.R.D. 46, 51-52 (M.D. N.C. 1987). However, given that the other factors weigh against finding waiver, the court did not clearly err in finding that the privilege was not waived in this case.[4]

---

[4] Judson Atkinson argues that CIC lacks standing to assert the privilege because the memorandum was produced by Carroll's attorneys. It asserts that the defendants are trying to have it both ways by simultaneously arguing that Carroll is not CIC's alter ego but is an agent for the purposes of considering whether the memorandum is covered by the attorney-client privilege. But Judson Atkinson's position—that an individual cannot be an agent of a corporation without being its alter ego—is baseless. It is well-established that corporations enjoy the protection of the attorney-client privilege. *See Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 348, 105 S. Ct. 1986, 85 L. Ed. 2d 372 (1985); *Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S. Ct. 677, 66 L. Ed.2d 584 (1981). Corporations, being "artificial creature[s] of the law," must act through individuals. *Upjohn*, 449 U.S. at 389, 101 S. Ct. 677. This includes communicating with their attorneys, which must be done via individual employees or agents. Carroll is the sole shareholder and CEO of CIC. As such, the privileged nature of communications be-

(continued...)

## III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, VACATED and REMANDED in part. The appellant shall bear the costs of the appeals.

---

[4] (...continued)
tween CIC and its attorneys remains intact when Carroll is privy to those communications. *See Commodity Futures Trading Com'n*, 471 U.S. at 348, 105 S. Ct. 1986.

---